# 14-2619-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
Trustee for The Registered Certificate Holders of Morgan Stanley Capital I Inc.
Commercial Mortgage Pass-Through Certificates Series 2007-IQ14, acting
by and through C-III Asset Management LLC, as Special Servicer,

*Plaintiff-Appellant,*

— v. —

MORGAN STANLEY MORTGAGE CAPITAL, INC.,

*Defendant-Appellee.*

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## FINAL FORM BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

DAVID A. BARRETT
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiff-Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned counsel for Plaintiff-Appellant The Bank of New York Mellon Trust Company, National Association, certifies pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure as follows:

The Bank of New York Mellon Trust Company, National Association, is a wholly-owned subsidiary of The Bank of New York Mellon Corporation. No publicly held corporation owns 10% or more of its stock.

C-III Asset Management LLC is a wholly-owned subsidiary of C-III Capital Partners LLC, which is managed by a wholly-owned subsidiary of Island Capital Group LLC. No publicly held corporation owns 10% or more of Island Capital Group LLC or C-III Capital Partners LLC.

## <u>TABLE OF CONTENTS</u>

**PAGE**

TABLE OF AUTHORITIES ................................................................................ iii

JURSIDICTIONAL STATEMENT ...................................................................... 1

ISSUES PRESENTED .......................................................................................... 1

PRELIMINARY STATEMENT ........................................................................... 2

STATEMENT OF THE CASE .............................................................................. 4

STATEMENT OF FACTS .................................................................................... 6

      A.    Agreements at Issue ................................................................... 6

      B.    Morgan Stanley's Breach of the Environmental Representation ........ 10

      C.    The Special Servicer's Investigation and Notice of the $81 Million City View Loan Default ......................................... 13

      D.    Morgan Stanley's Refusal to Repurchase the City View Loan .......... 20

SUMMARY OF ARGUMENT .............................................................................. 20

STANDARD OF REVIEW ................................................................................... 22

ARGUMENT ......................................................................................................... 23

I.     THE SPECIAL SERVICER GAVE PROPER NOTICE TO REQUIRE MORGAN STANLEY TO REPURCHASE THE CITY VIEW LOAN ................................................................................. 23

      A.    Because the Special Servicer Complied with Its Notice Obligations, Morgan Stanley Was Required to Repurchase the Loan ................................................................................ 23

      B.    Sending a "Notice to Cure" Was Not a Condition Precedent to Morgan Stanley's Repurchase Obligation ........................... 35

i

II.     EVEN IF THE REQUEST TO CURE WERE UNTIMELY, ITS
        DELAY DOES NOT EXCUSE MORGAN STANLEY'S
        REPURCHASE OBLIGATION ................................................................ 44

        A.      The Special Servicer's Alleged Breach of the Notice and Cure
                Provisions Is Immaterial ...................................................... 45

        B.      Because the Special Servicer at least Substantially Performed
                Its Contractual Duties, Morgan Stanley Must Comply with Its
                Repurchase Obligation ........................................................ 49

        C.      Even if the Request to Cure Were a Condition Precedent, Delay
                Does Not Excuse Morgan Stanley's Repurchase Obligation ............ 52

        CONCLUSION ........................................................................................ 55

# TABLE OF AUTHORITIES

## Cases

*326-330 E. 35th St. Assoc. v. Sofizade*,
  741 N.Y.S.2d 380 (1st Dep't 2002)....................................................34

*Ace Sec. Corp. Home Equity Loan Trust, Series 2007–HE3 ex rel. HSBC
  Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*,
  No. 13 Civ. 1869, 5 F. Supp. 3d 543 (S.D.N.Y. 2014)........................... 37, 45, 49

*Aeolus Down, Inc. v. Credit Suisse Int'l*,
  No. 10 Civ. 8293, 2011 WL 5570062 (S.D.N.Y. Nov. 16, 2011).......................52

*Assured Guaranty Mun. Corp. v. DB Structured Prods., Inc.*,
  927 N.Y.S.2d 880 (N.Y. Sup. Ct. 2011)....................................... 41, 42

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*,
  361 F. Supp. 2d 283 (S.D.N.Y. 2005) ..................................................45

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
  738 F. Supp. 2d 450 (S.D.N.Y. 2010) ........................................ 53, 54

*Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured
  Prods., Inc.*,
  958 F. Supp. 2d 488 (S.D.N.Y. 2013) ................................................25

*Diamond Castle Partners IV PRC, L.P. v. IAC/InterActive Corp.*,
  918 N.Y.S.2d 73 (1st Dep't 2011)......................................................37

*Encompass Ins. Co. of Am. v. English*,
  No. 11 Civ. 2606, 2013 WL 796309 (S.D.N.Y. Mar. 5, 2013) ...........................45

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*,
  111 F.3d 284 (2d Cir. 1997) ............................................................45

*Ginett v. Computer Task Grp., Inc.*,
  962 F.2d 1085 (2d Cir. 1992) ................................................. 35, 36

*Giuffre Hyundai, Ltd. v. Hyundai Motor America*,
  756 F.3d 204 (2d Cir. 2014) ................................................. 33, 34

iii

*GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*,
  618 F.3d 204 (2d Cir. 2010) ...............................................................27

*Gulf Ins. Co. v. Transatlantic Reinsurance Co.*,
  886 N.Y.S.2d 133 (1st Dep't 2009) ....................................................25

*Hicksville Mach. Works Corp. v. Eagle Precision, Inc.*,
  635 N.Y.S.2d 300 (2d Dep't 1995)......................................................34

*IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*,
  26 F.3d 370 (2d Cir. 1994) .................................................................25

*Int'l Fid. Ins. Co. v. Rockland*,
  98 F. Supp. 2d 400 (S.D.N.Y. 2000) ...................................................29

*Israel v. Chabra*,
  537 F.3d 86 (2d Cir. 2008) ........................................................ 35, 38

*Jacob & Youngs v. Kent*,
  230 N.Y. 239 (1921)...........................................................................52

*LaSalle Bank Nat'l Ass'n ex rel Lennar Partners, Inc. v. Capco American
  Securitization Corp.*,
  No. 02 Civ 9916, 2005 WL 3046292 (S.D.N.Y. Nov. 14, 2005)................ 24, 25

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
  846 N.Y.S.2d 95 (1st Dep't 2007)......................................................48

*LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate Inc.*,
  No. 02 Civ 7868, 2003 WL 1461483 (S.D.N.Y. Mar. 21, 2003).......................50

*LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*,
  No. 02 Civ. 7868, 2003 WL 21671812 (S.D.N.Y. July 16, 2003) .... 36, 37, 43, 44

*Lehman Bros. Holdings Inc. v. Laureate Realty Servs., Inc.*,
  No. 1:04 Civ. 1432, 2007 WL 2904591 (S.D. Ind. Sept. 28 2007).....................43

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
  766 N.Y.S.2d 561 (1st Dep't 2003)....................................................30

*Mackinder v. Schawk, Inc.*,
  No. 00 Civ. 6098, 2005 WL 1832385 (S.D.N.Y. Aug. 2, 2005)..........................38

iv

*Mastrovincenzo v. City of New York*,
435 F.3d 78 (2d Cir. 2006) ...............................................................28

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007) .............................................................49

*Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*,
No. 00 Civ. 8613, 2002 WL 818082 (S.D.N.Y. Apr. 30, 2002) .................. 42, 43

*Mount Sinai Hosp. v. 1998 Alexander Karten Annuity Trust*,
970 N.Y.S.2d 533 (1st Dep't 2013).....................................................52

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
599 F.3d 102 (2d Cir. 2010) ................................................... 30, 31, 32

*NFL Enterprises LLC v. Comcast Cable Commc'ns, LLC*,
851 N.Y.S.2d 551 (1st Dep't 2008).....................................................29

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
86 N.Y.2d 685 (1995) ......................................................................35

*PaineWebber Inc. v. Bybyk*,
81 F.3d 1193 (2d Cir. 1996) .............................................................22

*Prudential Ins. Co. of Am. v. S.S. Am. Lancer*,
870 F.2d 867 (2d Cir. 1989) .............................................................39

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*,
769 F.3d 807 (2d Cir. 2014) .............................................................22

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*,
No. 09 Civ. 3106, 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011) .......................42

*Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*,
No. 04 Civ. 9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005)............ 43, 48, 51

*U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.*,
No. 12 Civ. 9412, 2014 WL 3368670 (S.D.N.Y. July 9, 2014).............. 36, 46, 49

*Unigard Sec. Ins. Co. v. North Riv. Ins. Co.*,
79 N.Y.2d 576 (1992) ......................................................................35

*Wood v. Duff-Gordon*,
  222 N.Y. 88 (1917) ...............................................................................54

**Statutes**

28 U.S.C. §1291 ......................................................................................1

28 U.S.C. §1332 ......................................................................................1

**Other Authorities**

Restatement (Second) of Contracts ........................................... 45, 46, 47, 48, 49, 53

## JURSIDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000. This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291. Final judgment disposing of all claims was entered on June 17, 2014. Special Appendix ("SPA") 1. The Notice of Appeal was timely filed on July 16, 2014. Joint Appendix ("JA") 1835-36.

## ISSUES PRESENTED

1.  Did the District Court err in construing contractual provisions governing the securitization of commercial mortgage loans to require, as a condition precedent to compelling a seller to repurchase a defaulted $81 million loan, that the loan's servicer must give notice and request cure of the loan-seller's material breach of a representation and warranty concerning the loan, within three business days of discovering the breach.

2.  Did the District Court err in holding that, upon discovery, any delay greater than three business days in making a request to cure a material breach voided a loan-seller's otherwise unconditional obligation to repurchase a defaulted loan, where the breach was incurable and any alleged delay caused no harm to the loan-seller.

1

## PRELIMINARY STATEMENT

At issue in this appeal is whether Morgan Stanley should escape entirely its obligation to repurchase an $81 million loan, with respect to which it allegedly failed to disclose its knowledge of material environmental defects when it sold the loan to a securitization trust. In particular, assuming the breach was material, can Morgan Stanley avoid repurchase on the basis that Appellant's request to cure the breach was allegedly "late," even though the request accompanied a simultaneous timely notice of the breach.

The plain language of the agreements at issue provides that when any party discovers a material breach, notice of breach must be given "promptly" to the other parties. The plain language further provides that a 90-day cure period begins when Morgan Stanley receives that notice of breach; and that if Morgan Stanley fails to cure the breach, or the breach is incurable, it must repurchase the loan. The District Court recognized that three months was a reasonable period in which to conduct an investigation into the breach, and found that the breach was incurable. Yet it did not enforce Morgan Stanley's repurchase obligation, saddling the trust with a worthless loan that will ultimately result in forfeiture of some $81 million in principal, plus interest, by investors in the securitized pool of commercial mortgages that Morgan Stanley issued.

2

Instead, the District Court held that sending a request to cure within three business days of Appellant's becoming aware of the material breach was a condition precedent to Morgan Stanley's repurchase obligation. In so holding, the District Court reached the insupportable conclusion that while the notice of breach was timely, the request to cure the very same breach, sent at the very same time in the same letter as the notice, was not timely. In other words, the District Court held that Appellant was required to request cure of a breach before it was required to give notice of the same breach. Neither the contract language nor the law admits of such an absurd result.

Nor was this the District Court's only error. The court held that a request to cure was required even when the breach was incurable, which is contrary to common sense and this Court's express precedent. Moreover, it failed to recognize any supposed "breach" of the request to cure provision was immaterial and therefore precludes forfeiture of Morgan Stanley's repurchase obligation regardless of whether the sending of a request to cure is analyzed as a promise or as a condition precedent. The District Court's contract interpretation was wrong and its judgment should be reversed.

3

## STATEMENT OF THE CASE

Appellant filed the operative complaint in this action on June 30, 2011, alleging that Morgan Stanley made materially false representations and warranties with respect to an $81 million loan (the "City View Loan" or "Loan") that Morgan Stanley included in a large pool of mortgages that secured commercial mortgage backed securities ("CMBS") issued by Morgan Stanley. JA-390-93 (First Am. Compl. at ¶¶ 131-58). Appellant alleged that Morgan Stanley falsely represented that it had "no knowledge of any material and adverse environmental condition or circumstances affecting" the property subject to the Loan (the "Material Breach"). JA-390 (*Id.* at ¶ 134 (internal quotations omitted)). The complaint alleged that Morgan Stanley wrongly refused to cure the Material Breach (which was impossible in any event) or to repurchase the Loan, as required by the CMBS contracts, within 90 days after receiving Appellant's timely notice of breach and simultaneous request to cure. JA-391-92 (*Id.* at ¶¶ 139-146).

Following completion of discovery, the parties cross-moved for summary judgment on September 21, 2012. JA-437-38, 603-04 (Notices of Motion). In its motion, Appellant argued that it was entitled to summary judgment on its claim that Morgan Stanley committed a Material Breach and was contractually obligated to repurchase the Loan. SPA-24-25, 51. Morgan Stanley cross-moved for summary judgment, arguing in part that, because Appellant failed to provide

4

Morgan Stanley with timely notice of the Material Breach, Morgan Stanley was excused from its repurchase obligation. SPA-26.

By Decision and Order filed June 19, 2012, the District Court denied Appellant's motion for summary judgment, and held that, under the Agreements, Appellant was required to send a "notice to cure" within three business days of becoming aware of a Material Breach as a condition precedent to Morgan Stanley's repurchase obligation. SPA-30. The District Court ordered Appellant to provide additional discovery and to waive attorney-client privilege to allow inquiry into whether Appellant had satisfied this supposed condition precedent. SPA-39-40.

Morgan Stanley thereafter filed a supplemental motion for summary judgment on October 30, 2013. JA-1104-05. Morgan Stanley argued that it was entitled to dismissal of Appellant's breach of contract claim because Appellant had failed to satisfy the supposed condition precedent and thus forfeited its sole remedy under the Agreements for a Material Breach of Morgan Stanley's representations. *See* SPA-64, 67. The District Court agreed, and granted summary judgment in favor of Morgan Stanley on June 16, 2014. SPA-67. Judgment was entered the next day. JA-1834.

Appellant timely filed its Notice of Appeal on July 16, 2014.  JA-1835-36.[1]

## STATEMENT OF FACTS[2]

### A. Agreements at Issue

This appeal involves interpretation of two contracts: a Mortgage Loan

Purchase Agreement ("MLPA") and a Pooling and Servicing Agreement ("PSA")

(collectively, the "Agreements").[3]  The Agreements reference an underlying

mortgage that was made by Morgan Stanley Mortgage Capital Inc. ("Morgan

Stanley" or, for reasons described in the following paragraph, "Seller") to City

View Center, LLC ("City View").  City View used the mortgage to acquire a

newly-developed retail shopping center located in Garfield Heights, Ohio (the

"City View Property").  JA-372 (Pl.'s Amended Complaint at ¶¶ 8, 9).  City

---

[1]  This appeal is taken only from the grant of Morgan Stanley's motions for summary judgment, and not from the denial of Appellant's own motion for summary judgment.  In addition, Appellant does not contest the District Court's grant of summary judgment on a second alleged breach of Morgan Stanley's representations and warranties that arose from the same facts.  *See* SPA-40-41. Finally, Morgan Stanley has not appealed the District Court's grant of summary judgment to Appellant dismissing Morgan Stanley's waiver defense.  *See* SPA-42-51.

[2]  To the extent that facts are disputed, they are presented here in the light most favorable to Appellant.  *See* p. 22, below.

[3]  New York law governs both Agreements.  JA-463-64 (MLPA §14); JA-347-48 (PSA §15.4).

6

View's $81 million Loan was obtained from Morgan Stanley in December 2006. *See* JA-901 (Pl.'s Summ. J., Def.'s Resp. to Pl.'s 56.1 Statement at ¶ 1).

Morgan Stanley then sold the City View Loan to its affiliate, Morgan Stanley Capital I Inc. ("MS Capital" or "Purchaser") pursuant to the MLPA, dated May 1, 2007. JA-441 (MLPA §1). Pursuant to the PSA, also dated May 1, 2007, MS Capital pooled the City View Loan (the eighth largest loan in the pool) with over 400 other commercial mortgages into a $4.9 billion trust (the "Trust").[4] *See* SEC Free Writing Prospectus, dated May 8, 2007.[5] The beneficiaries of this Trust were, in turn, the registered certificateholders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates Series 2007-IQ14 (the "IQ14 securities"). *See* JA-27-28 (PSA (Preliminary Statement)). The Bank of New York Trust Company, National Association, executed the PSA as trustee of the Trust (the "Trustee"). *See* JA-108 (PSA §1.1 (Definition of "Trustee")).

Also parties to the PSA are "servicers." Under the PSA, there are several Master Servicers and a Special Servicer, which act on behalf of the Trustee and for the benefit of the investors. *See* JA-103-04 (PSA §1.1 (Definition of "Servicing Standard")). The Master Servicers are responsible for collecting payments from mortgagors and performing routine loan administration functions. *See* JA-215-17

---

[4] The City View Loan thus accounted for approximately 1.7% of the value of the CMBS trust.

[5] www.sec.gov/Archives/edgar/data/762153/000095013607003294/file1.htm.

(PSA §8.3(a)).  When a loan goes into default, the administration of the loan is transferred from the Master Servicer to the Special Servicer.  *See* JA-266 (PSA §9.1(a)); JA-104-05 (PSA §1.1 (Definition of "Servicing Transfer Event")).  C-III Asset Management LLC (formerly Centerline Servicing Inc.) is the Special Servicer responsible for the City View Loan.  *See* JA-105 (PSA §1.1 (Definition of "Special Servicer")).

The key provisions at issue in this appeal concern the discovery and notice of a Material Breach,[6] and are substantively the same in the MLPA (section 5) and PSA (section 2.3).[7]  The MLPA provides: [8]

---

[6]   The question whether a Material Breach (as defined by the Agreements) actually occurred is not at issue in this appeal, although it would be addressed if the case is remanded for trial.

[7]   The District Court focused on the MLPA because Morgan Stanley made certain representations and warranties in the MLPA "for the benefit of the Trustee on behalf of the holders of the Certificates."  JA-454 (MLPA §5(a)); *see also* SPA-5. Although the Trustee and Servicers were not signatories to the MLPA, "[t]he express representations and warranties contained in the Environmental [Representation] . . . were made by [Morgan Stanley] to [MS Capital] under the MLPA [], and were assigned to the Trustee, as if they were made by [Morgan Stanley] directly to the Trustee, pursuant to the PSA."  JA-919 (Pl.'s Summ. J., Def.'s Resp. to Pl.'s 56.1 Statement at ¶ 28).  The Trustee, in turn, pursuant to §2.3(e) of the PSA, appointed the Special Servicer as its designee to enforce §2.3 of the PSA.  *See* JA-793 (Def.'s Summ. J., Ex. 8 (Limited Power of Attorney) at S-1A-1) (granting the Special Servicer "full power and authority to do and perform any and every act necessary, requisite, or proper" in connection with "servic[ing] and administer[ing] the [Loan].").

8

Section 5.  <u>Remedies Upon Breach of Representations and Warranties</u>
<u>Made by the Seller</u>.

. . . . (b)  It is hereby further acknowledged that . . . if there is a breach
of any of the representations and warranties required to be made by
the Seller [Morgan Stanley] regarding the characteristics of the
Mortgage Loans and/or the related Mortgaged Properties . . . , and . . .
both (A) the . . . breach materially and adversely affects the value of
the Mortgage Loan and (B) the Mortgage Loan is a Specially Serviced
Mortgage Loan . . . (. . . a "Material Breach"), the party discovering
such . . . Material Breach shall promptly notify, in writing, the other
party . . . .  Promptly (but in any event within three Business Days)
upon becoming aware of any such . . . Material Breach, the Master
Servicer shall, and the Special Servicer may, request that the Seller,
not later than 90 days from the Seller's receipt of the notice of such
. . . Material Breach, cure such . . . Material Breach . . . in all material
respects . . . .

The Seller hereby covenants and agrees that, if any . . . Material
Breach cannot be corrected or cured in all material aspects within the
above cure periods, the Seller shall, on or before the termination of
such cure periods, . . . repurchase the affected Mortgage Loan . . . .

In sum, upon "discovering" a Material Breach, a "party" must "promptly

notify, in writing, the other party;" a request to cure "may" be sent by the Special

Servicer within three business days of "becoming aware" of such breach;[9] a cure

---

[8]   The full text of the relevant paragraphs of the MLPA and PSA is set forth in an
Addendum to this Brief.  The text of the entire MLPA is reproduced at JA-440 to
JA-494, and the text of the entire PSA is reproduced at JA-17 to JA-369.

[9]   A fundamental error made by the District Court was to apply the time period
("three Business Days") stated in the second sentence above (concerning the
request to cure) to displace the time period provided in the first sentence for giving

9

period of 90-days is measured from when the notice of breach, not the request to cure, is received by Morgan Stanley; and when a breach is incurable, Seller—Morgan Stanley—must repurchase the loan.

## B. Morgan Stanley's Breach of the Environmental Representation

As noted, not at issue in this appeal is whether a Material Breach occurred. However, because the circumstances in which a breach was detected are at issue, the nature of the breach is discussed below.

The City View Property was built on the site of two closed landfills, which made environmental representations of heightened importance. JA-902 (Pl.'s Summ. J., Def.'s Resp. to Pl.'s 56.1 Statement at ¶ 8). In the MLPA, Morgan Stanley represented and warranted that as of the time of securitization on May 30, 2007, it "ha[d] no knowledge of any material and adverse environmental condition or circumstance affecting any Mortgaged Property that was not disclosed in [the Environmental Report]" (the "Environmental Representation"). JA-473 (MLPA Ex. 2 §(12)(i)); *see* JA-451 (MLPA §4(a)). The Environmental Report, dated July 25, 2006, stated that an "assessment has revealed no evidence of recognized environmental conditions in connection with the [City View Property]" and that "there are no outstanding violations at the [City View Property]." JA-500 (Pl.'s Summ. J., Ex. 5 at MSMC0048413); *see* JA-510 (*id.* at MSMC0048423).

---

notice of breach ("promptly"). *See* SPA-58 ("The MLPA gave the Special Servicer three days to send out notice of any breach."); and Point I.A, below.

Between the July 2006 Environmental Report and securitization on May 30, 2007, however, numerous significant environmental problems surfaced at the City View Property. These problems included repeated intrusion of methane gas generated by the landfill, at explosive levels, into a Wal-Mart store that was the shopping center's largest tenant. JA-906 (Pl.'s Summ. J., Def.'s Resp. to Pl.'s 56.1 Statement at ¶ 15). Ultimately, the methane leaks caused Wal-Mart to close the store and terminate its lease, which effectively rendered the City View development an economic failure. JA-548-49 (Pl.'s Summ. J., Ex. 21). As the District Court noted, the methane conditions were not disclosed in the Environmental Report. SPA-20.

Moreover, Morgan Stanley was aware of the environmental issues as early as December 2006. Wal-Mart informed Morgan Stanley on December 28, 2006, that "[m]ethane was detected in the store at levels above 100% of the lower explosive level, which required a temporary closure of the store for two days." JA-536 (Pl.'s Summ. J., Ex. 9). On the same day, Morgan Stanley's Head of Underwriting confirmed Morgan Stanley's receipt of the message and emphasized that "clearly the Wal-Mart problem will highlight the fact that we have environmental problems." JA-552 (Pl.'s Summ. J., Ex. 23, at MSMC0031641).

The next day, Morgan Stanley received a letter from City View which referred to numerous "notices of violations" issued by the Ohio EPA relating to

11

methane gas intrusions. JA-788 (Def.'s Summ. J., Ex. 6 at P000615). A document titled "Closing Counsel Transaction Summary" ("Closing Summary"), which was prepared by Morgan Stanley's counsel around January 1, 2007, recognized that the Environmental Report "did not address the numerous 'notices of violation' issued by the Ohio Environmental Protection Agency that [the City View Property is] subject to." JA-871 (Def.'s Summ. J., Ex. 16, Item 62 at MSMC0071469).

On March 7, 2007, Morgan Stanley received a copy of a February 23, 2007 letter from Wal-Mart to City View that called attention to the "spiking levels of methane intrusion in [the] store" and emphasized that these "need to be remedied immediately." JA-539-41 (Pl.'s Summ. J., Ex. 12).

Prior to the IQ14 securitization on May 30, 2007, Morgan Stanley attempted to include the City View Loan in two other securitization deals, but did not do so because certain investors "asked to have the City View [L]oan removed from the pool." JA-959-60 (Def.'s Opp. to Pl.'s Summ. J., Ex. 9 (Eckes Dep.) at 188:20-189:4.) In a March 19, 2007 report issued in connection with the earlier securitization attempts, Morgan Stanley disclosed to potential investors that: (1) "[i]n December 2006, elevated methane was detected in the Wal-Mart store"; (2) there was a "two-day closure of the Wal-Mart"; and (3) "Wal-Mart notified [City View] of alleged continued methane gas intrusions" in February 2007. JA-578 (Pl.'s Summ. J., Ex. 24 at P002312); *see* JA-591 (Pl.'s Summ. J., Ex. 27 (Yee

12

Dep.) at 183) (Ivan Yee of Morgan Stanley agreeing that it was "important" to disclose "the Wal-Mart store closure and the methane intrusion at the Wal-Mart store" to the potential investors). In an e-mail explaining why one of the investors did "not want the [Mortgage Loan] in the [other] deal," William Sampson, Executive Director of Morgan Stanley's Mortgage Group, stated that the investor's "issues" with City View were "[a]ll environmental, of course." JA-594-95 (Pl.'s Summ. J., Ex. 30 at MSMC0039041–42).[10] Those disclosures of methane gas releases and environmental problems were not made in the offering materials for the IQ14 securities. *See* SPA-20 ("The parties agree that the [Environmental Report] does not contain any particularized reference to any of the specific methane-related incidents that occurred at the Wal-Mart store between October 2006 and May 2007, when the transaction closed.").

## C. The Special Servicer's Investigation and Notice of the $81 Million City View Loan Default

The methane problems at the City View Property continued after the IQ14 securitization closed on May 30, 2007. *See* JA-599 (Pl.'s Summ. J., Ex. 35 (Expert Report of Defendant's Expert Roger Ritley) at 10) ("[C]ontinued environmental issues arose into the Fall of 2008."). Faced with continuing safety concerns caused

---

[10] *See* JA-928-29 (Def.'s Opp. to Pl.'s Summ. J, Def.'s Resp. to Pl.'s 56.1 Statement at ¶ 45) (stating that Morgan Stanley disputes its motivation for removing the Loan from the pool, but that "Morgan Stanley does not dispute that [it] removed the [Loan] or that, after [the Loan] was removed from [the pool], the investor invested in the [pool].").

13

by the intrusion of methane gas, Wal-Mart closed its store in September 2008 and terminated its lease in January 2009. JA-548-49 (Pl.'s Summ. J., Ex. 21). Shortly thereafter, other tenants in the City View Property similarly began "clos[ing] their stores and vacat[ing] the premises." JA-599 (Pl.'s Summ. J., Ex. 35 at 10).

Faced with a revenue shortfall, City View defaulted on payment due under the Loan on November 8, 2008. *See* JA-619 (Def.'s Summ. J., Def.'s 56.1 Statement at ¶ 46). As a result, the administration of the City View Loan was transferred from the Master Servicer to the Special Servicer on November 12, 2008. JA-1109 (Def.'s Supp. Summ. J., Def.'s 56.1 Statement at ¶ 9).

On January 13, 2009, the Special Servicer received materials for the first time from the Master Servicer's files which contained key information raising the possibility of a Material Breach by Morgan Stanley. *See* JA-1710, 1717-18 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 1 (Wilkicki Supp. Dep.) at 106:14-24; 127:18-128:19). These materials included the Closing Summary, *see* p. 12, above, which shows that Morgan Stanley knew of material omissions in the Environmental Report. After studying these materials and other information, *see* JA-1718-19 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 1 (Wilkicki Supp. Dep.) at 128:9-129:1); JA-1762 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 4 (Unell Dep.) at 19:8-13), Jennifer Wilkicki, an asset manager for the Special Servicer, prepared a draft memorandum intended for senior management that was finished on February 16,

14

2009, and stated that "[t]he Special Servicer believes it has discovered a Material Breach" of the Environmental Representation.  JA-896 (Def.'s Summ. J., Ex. 32 at P007228); *see also id.* ("The Special Servicer has discovered that the Seller was aware of material and adverse environmental conditions and circumstances affecting the Mortgaged Property that were not disclosed in the Environmental Report.").

In response to the draft memorandum, Jenna Unell, then Assistant General Counsel of the Special Servicer, told Wilkicki that she "agree[d] there is evidence that [Morgan Stanley] knew that there were material environment conditions or circumstances affecting the Property that were not disclosed[.]  Please call me to discuss further."  JA-1266 (Def.'s Supp. Summ. J., Ex. 4).  In the following weeks, Wilkicki and Unell "strugg[led] and grappl[ed]" to confirm not only that Morgan Stanley had breached the Environmental Representation by knowingly failing to disclose any "material and adverse environmental condition or circumstance" that was not included in the Environmental Report, but also that such breach amounted to a "Material Breach" under the MLPA.[11]  JA-1761-62, 1770-71 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 4 (Unell Dep.) at 18:14-19:13; 30:14-31:4).  As part of

---

[11]   A "Material Breach" must either "materially and adversely affect[] the interests of the holders of the Certificates in the [] Mortgage Loan" or "materially and adversely affect[] the value of [a Specially Serviced] Mortgage Loan."  JA-454 (MLPA §5(b)).

this process, Wilkicki and Unell analyzed, *inter alia*, the Environmental Report, the Closing Summary, the MLPA, the PSA, notices of violation issued by the Ohio EPA, various loan documents, and files relating to a 2008 lawsuit initiated by the Ohio Attorney General and Ohio EPA against City View for failure to prevent the intrusion of noxious landfill gasses onto the Property.[12] JA-1764-65, 1789-90 (*id.* at 21:11-22:21; 211:7-212:9). As the District Court said, Special Servicer "had to review potentially extensive Mortgage Loan documents and files against the [Environmental] Report, and determine, based on fact and law, that (1) the environmental conditions were 'material and adverse,' (2) Morgan Stanley was aware of the conditions at the time it made its representations, and (3) the breach of the warranty 'materially and adversely' affected the value of the Mortgage Loan." SPA-37-38 (emphasis added).

---

[12] The District Court appeared to make a factual finding that this analysis was makeweight: "Despite all this 'struggling and grappling,' the only specific analysis that Unell could recall performing was reviewing the documents that the Special Servicer already possessed, and that Wilkicki had already reviewed, before February 16." SPA-60. As an initial matter, it is not clear what the District Court thought was not credible about a more senior employee and in-house counsel reviewing the basis of a more junior non-lawyer's "belie[f]" she had "discovered" a Material Breach. *See* pp. 40-41, below. In any event, it is not the District Court's province to decide that, rather than laudable thoroughness and honest analysis, this evaluation process was a pretextual waste of time. At summary judgment, the District Court is not a fact-finder and should have drawn all inferences in Appellant's favor.

16

To confirm that Morgan Stanley's breach was "material" under the terms of the MLPA, the Special Servicer engaged an appraiser to "determine what the current value [of the City View Property] was." JA-1768 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 4 (Unell Dep.) at 26:15-23); *see also* JA-1700-01 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 1 (Wilkicki Supp. Dep.) at 76:8-77:1). On February 27, 2009, the Special Servicer received a draft appraisal, which reported that the Property was worth only $22.3 million, representing loss in value of some $81 million from the pre-securitization valuation. JA-1739 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 1 (Wilkicki Supp. Dep.) at 177:10-23). To satisfy the appraisal requirement and to "make sure [the draft appraisal] was correct," Wilkicki commissioned a review appraiser, who confirmed the value on March 13, 2009.[13] *See* JA-36 PSA §1.1 (Definition of "Appraisal"); JA-1812 (Pl.'s Opp. to Def.'s

---

[13]   The District Court found that Wilkicki's testimony that the review appraisal was "instrumental" and "critical," and Unell's testimony that "the Special Servicer needed an 'expert opinion' (an appraisal) to determine the current value of the Property before it could make any decisions with respect to Morgan Stanley" were "errant nonsense" and an "obvious attempt to stall." SPA-62-63. Such credibility determinations are the province of the ultimate finder of fact, however, not a court on summary judgment. In fact, the Special Servicer's standard practice, in compliance with FIRREA and its other regulatory mandates, was to obtain appraisals and review appraisals annually on all properties for which it was responsible; these were used to calculate net present values for the properties and were used by certificateholders in their own financial statements and reporting. Following the usual procedure before declaring a Material Breach was clearly appropriate.

17

Supp. Summ. J., Ex. 4 (Unell Dep.) at 311:1-9); JA-1704, 1730 (Pl.'s Opp. to

Def.'s Supp. Summ. J., Ex. 1 (Wilkicki Supp. Dep.) at 84:1-13; 167:8-14).

Wilkicki and Unell, however, did not have the authority to issue a notice of

breach to Morgan Stanley.  *See* JA-1829 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex.

6 (Smyth Dep.) at 117:2-7).  Wilkicki's duties were limited to "gather[ing]

information" regarding potential breaches and "consult[ing] with management"

about the "possibilit[y]" of breach.  JA-1697 (Pl.'s Opp. to Def.'s Supp. Summ. J.,

Ex. 1 (Wilkicki Supp. Dep.) at 31:9-24).  Accordingly, Wilkicki's supervisor

instructed her to send the draft notice of breach to Paul Smyth, the Special

Servicer's President, for review and approval.  JA-1740-41 (Pl.'s Opp. to Def.'s

Supp. Summ. J., Ex. 1 (Wilkicki Supp. Dep.) at 179:15-180:11).  Only Smyth had

the requisite authority to bind the corporation.  *See* JA-1829 (Pl.'s Opp. to Def.'s

Supp. Summ. J., Ex. 6 (Smyth Dep) at 117:2-7).

Approval by the President of the company was necessary because noticing a

material misrepresentation would be a serious charge against a respected, major

financial institution.  Pursuant to the PSA, such a notice would have to be

publically distributed, *see* JA-121 PSA §2.3(a) (requiring that notice of breach be

sent to "each Rating Agency"), and it would be "putting essentially the world,

including the rating agencies and all the certificate holders, on notice that [Morgan

Stanley] ha[d] done something [it] shouldn't have done."  JA-1821 (Pl.'s Opp. to

18

Def.'s Supp. Summ. J., Ex. 5 (Crouch Dep.) at 114:8-19). In effect, sending the notice of breach was tantamount to a public accusatory instrument and it was important—for Morgan Stanley also—that the notice be sent only if it were accurate and justified. Smyth approved the notice of breach on March 16, 2009.[14] *See* JA-1829, 1830 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 6 (Smyth Dep.) at 117:14-22; 123:14-17).

On March 18, 2009—two days after the company's president concluded on behalf of the Special Servicer that there existed a Material Breach—the Special Servicer sent a letter to Morgan Stanley that contained both a notice of breach and a request to cure. JA-1791 (Pl.'s Opp. to Def.'s Supp. Summ. J., Ex. 4 (Unell Dep. Tr.) at 223:3-12). This was approximately two months after the Special Servicer received many of the loan documents from the Master Servicer, a month after Wilkicki expressed the "belie[f]" that she had "discovered" a Material Breach, and days after the appraisal process was completed. As the District Court recognized, "[t]hree months to conduct an investigation into potential breaches of the representations and warranties is not per se unreasonable in a transaction of this type." SPA-37.

---

[14] Again, the District Court appears to have made factual findings that Mr. Smyth's review was a "Rubber-Stamp," although recognizing that he "reviewed the final breach notice before it was sent." SPA-59-60. To the extent a dispute of fact exists as to the necessity and extent of Smyth's review, it must be resolved in Appellant's favor at the summary judgment stage.

19

## D. Morgan Stanley's Refusal to Repurchase the City View Loan

Under the terms of the MLPA, Morgan Stanley had 90 days from its "receipt of the notice of such . . . Material Breach" to cure the breach or repurchase the affected Loan. As the District Court found, however, "there was no way to cure" the breach. SPA-23; *see also* SPA-30 ("[C]ure [was] impossible[.]"). Accordingly, Morgan Stanley was contractually obligated to repurchase the City View Loan from the Trust by approximately June 17, 2009. By letter of May 11, 2009, Morgan Stanley refused to do so, stating that it "disagree[d] with [the Special Servicer's] characterization of the facts and circumstances" and "intend[ed] to vigorously defend its underwriting and disclosures made in the PSA and the Mortgage Loan." Morgan Stanley did not, however, make any assertion that the notice or request to cure was untimely. JA-1093 (Pl.'s Opp. to Def.'s Summ. J., Ex. H).

## SUMMARY OF ARGUMENT

The plain meaning of the Agreements dictate that a request to cure is timely when, as here, it is sent simultaneously with a timely notice of breach. The District Court recognized that the Special Servicer investigated and gave notice of the breach within a reasonable time of discovering it. But the court misconstrued the contracts by holding, in effect, that the notice of breach was ineffective because it was combined with a request to cure the breach that, the court said, should have

20

been sent within three business days of that same discovery. The court's construction of the contracts is wrong as a matter of law. It is premised on holding that the words "discovery" and "become aware of" refer to the same point in time even though the drafters used these very different words to refer to different acts in the same paragraph. It leads to the absurd result that a cure must be requested before the Servicer is given a reasonable time after discovery to investigate a possible breach and give notice of the breach. (Point I.A.)

Moreover, the request to cure provision is not a condition precedent to Morgan Stanley's repurchase obligation. Because conditions precedent "are not favored under New York law," they can be found only if they are stated in "unambiguous language." No language in the Agreements meets this high standard. (Point I.B.)

Even if the Special Servicer's request to cure were untimely, Morgan Stanley's repurchase obligation would be enforceable because the Special Servicer's alleged "breach" would be immaterial and its performance under the Agreements substantial. Indeed, the Material Breach was incurable and Morgan Stanley suffered no prejudice by any "delay" in requesting cure. (Points II.A-B.)

Finally, even if the Special Servicer's request to cure were untimely, and the request to cure were a condition precedent, Morgan Stanley's repurchase obligation would still be enforceable. New York law precludes enforcing a

21

forfeiture resulting from a breach of a condition precedent where the loss is vastly disproportionate to the materiality of the breach. That is plainly the case here, where investors will forfeit compensation for a loss of $81 million plus interest, while Morgan Stanley would have gotten no relevant benefit whatever if the supposed condition precedent had been met. (Point II.C.)

### STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to grant summary judgment, "construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 815 (2d Cir. 2014) (internal quotation marks omitted). This Court also reviews *de novo* "questions as to the plain meaning or ambiguity of the language of a contract." *Id.* (internal quotation marks omitted). "In interpreting a contract, the intent of the parties governs, and therefore a contract should be construed so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (applying New York law) (internal quotation marks and brackets omitted). "In interpreting a contract, words and phrases are given their plain meaning. Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement." *Id.* (internal quotation marks and brackets omitted).

22

## ARGUMENT

## I.  THE SPECIAL SERVICER GAVE PROPER NOTICE TO REQUIRE MORGAN STANLEY TO REPURCHASE THE CITY VIEW LOAN

The District Court erred in holding that "sending a notice to cure within three business days was a condition precedent to the repurchase obligation."  SPA-29;[15] *see* SPA-58 ("The MLPA gave the Special Servicer three days to send out notice of any breach.").  The plain meaning of the Agreements belies the District Court's conclusion.  Even if the agreements were ambiguous, however, Morgan Stanley cannot meet its heavy burden to show a condition precedent was intended.

### A. Because the Special Servicer Complied with Its Notice Obligations, Morgan Stanley Was Required to Repurchase the Loan

The Special Servicer sent Morgan Stanley a notice of breach "promptly" after discovering that breach, and simultaneously made a request to cure.  Because Morgan Stanley could not and did not cure the breach, its obligation to repurchase was triggered.

---

[15]  Indeed, the plain language of the MLPA says nothing about a "notice to cure"; that phrase, repeatedly used by the District Court, is not supported by the contract language.  The first sentence of §5(b) requires that a party "discovering" a breach "shall promptly notify" the breaching party "in writing," while the second sentence of §5(b) provides for a "request that the Seller . . . cure such . . . Material Breach," without specifying a writing.  JA-454 (MLPA §5(b)).  The District Court ignored this distinction, including the evident intent that the notice of breach must be a formal written document and therefore is distinct from the less formal request to cure.

23

As an initial matter, notice of breach was sent "promptly." The Special Servicer sent notice of breach to Morgan Stanley on March 18, 2009, having spent the approximately two months since receiving most of the key documents from the Master Servicer in mid-January, completing its investigation into the circumstances of the environmental hazards and City View's default, analyzing the relevant legal issues and securing the necessary approval from the company's president only two days earlier. *See* Statement of Facts Point C, above. The Wilkicki memorandum of February 16, 2009, about a month before notice was sent, expressed "belie[f]" that a Material Breach of the Environmental Representation had been "discovered." JA-896 (Def.'s Summ. J., Ex. 32 at P007228). A notice of breach issued under such circumstances is "prompt" under New York law. *See* SPA-37("Three months to conduct an investigation into potential breaches of the representations and warranties is not per se unreasonable in a transaction of this type.").[16]

Why this is so is explained by *LaSalle Bank Nat'l Ass'n ex rel Lennar Partners, Inc. v. Capco American Securitization Corp.*, No. 02 Civ. 9916, 2005 WL 3046292 (S.D.N.Y. Nov. 14, 2005). The trustee in that case received notice of

---

[16] Because three months was a reasonable investigatory period, the notice of breach was timely. The District Court's discussion of timeliness, however (*see* SPA-37-39), was entirely premised on the incorrect conclusion that the relevant time period was three business days after "discovery" or "becoming aware," which the District Court treated as referring to the same point in time.

24

facts suggestive of breach at the time the borrower filed for bankruptcy.  The court concluded that the "[trustee] need not have filed a claim immediately upon receiving notice of facts merely suggesting that [the seller] was in breach"; rather, "[the trustee] was required only to pick up the scent and nose to the source.  *If* the quest confirms [the] suspicion, *then* he must make the decision to raise the claim with reasonable dispatch."  *Id.*, at *3 (internal quotation marks and brackets omitted).  The court ultimately held that "it was reasonable for [the trustee] to spend time investigating whether the defect would cause [it] injury, and whether providing a defective filing was a breach of the PSA. . . . Due to the undoubtedly complex legal issues . . ., determining whether legal injury had occurred over the course of two months was reasonable."  *Id.*, at *4.  *See also Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 495 (S.D.N.Y. 2013) ("Notice given within two months of discovery of an alleged breach of contract is deemed reasonable under New York law.").

In nonetheless absolving Morgan Stanley of its repurchase obligation, the District Court made three errors of contract interpretation.[17]  *First*, the District

---

[17]  In addition to these errors, the District Court ignored evidence of the parties' conduct.  *See Gulf Ins. Co. v. Transatlantic Reinsurance Co*., 886 N.Y.S.2d 133, 143 (1st Dep't 2009) ("The parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties." (internal quotation marks and brackets omitted)); *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) ("For over a century, courts have looked to the conduct of the parties in resolving ambiguities in

Court wrongly concluded that "sending a notice to cure is required to trigger the running of the 90 day period within which the Loan must be repurchased." SPA-30. To the contrary, the MLPA expressly states that the cure period runs "90 days from the Seller's [Morgan Stanley's] receipt of the notice of such . . . Material Breach." JA-454 (MLPA §5(b)). That is, the 90 days run from Morgan Stanley's receipt of a notice of breach, not from the date of a request to cure. And the repurchase obligation is triggered "if any such . . . Material Breach cannot be corrected or cured in all material respects" within the cure period. JA-455 (MLPA §5(b)). In sum, the cure period runs 90 days from the notice of breach, and the repurchase obligation is triggered if cure is impossible within that period.

*Second*, the District Court wrongly imported the time period governing the request to cure into the notice of breach provision. SPA-33 (discussing the "Timeliness of the Special Servicer's Notices of Material Breach" as a requirement that the notices be "sent within three days after the Special Servicer became 'aware'" of the breach). Those provisions, which appear in consecutive sentences in the same paragraph of MLPA§5(b) state:

---

contractual language."). The Special Servicer's conduct demonstrates its understanding that it had a reasonable time to investigate the potential breach (and not merely "three business days"), because it had no reason not to act faster if it thought a shorter period applied. Similarly, Morgan Stanley's pre-litigation response to the March 18, 2009 notice of breach and request to cure did not even mention timeliness as a reason for rejecting the Special Servicer's position. *See* JA-1093 (Pl.'s Opp. to Def.'s Summ. J., Ex. H).

| Notice of Breach | Request to Cure |
|---|---|
| . . . the party discovering such Material Document Defect or Material Breach shall promptly notify, in writing, the other party . . . | Promptly (but in any event within three Business Days) upon becoming aware of any such . . . Material Breach, the Master Servicer shall, and the Special Servicer may, request that the Seller . . . cure . . . |

JA-454 (MLPA §5(b)).  Two differences between these provisions are immediately

apparent:  (1) the notice of breach calls for a party to "promptly notify," whereas

the request to cure calls for requesting cure "Promptly (but in any event within

three Business Days)"; and (2) the notice of breach requires prompt notice after

"discovering" a breach, whereas the request to cure is made "upon becoming aware

of" such breach.

The words "within three Business Days" do not appear in the first sentence

of the paragraph in §5(b) that requires sending a notice of breach.  That should end

the matter.  But the fact that both sentences use the word "promptly," while only

the second sentence (concerning the request to cure) further specifies a time frame,

is conclusive.  *See GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d

204, 214 (2d Cir. 2010) ("[S]pecific language in a contract will prevail over

general language where there is an inconsistency between two provisions."

(internal quotation marks omitted)).  Since, to give effect to both sentences, the

request to cure must be sent much more quickly than the notice of breach, *i.e.*,

within three days rather than within a reasonable time, which could be several months.

The parties' use of a specific and shortened time for making a request to cure makes clear the District Court's error in finding that the triggering condition for notice of breach ("discover[y]") is identical to the triggering condition for request to cure ("becoming aware"). *See* SPA-36 ("The use of the language 'becoming aware of' rather than 'discover' is of no moment."). It makes no sense whatever for the first sentence to allow several months for notice to be given after "discovery" (by using the word "promptly"), only to have that time period shortened to three days by the second sentence's reference to "becomes aware." Such absurd results must be avoided. *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) ("[W]hen interpreting contracts under New York state law, . . . [u]nless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." (internal quotation marks omitted)).[18]

---

[18]  The District Court argued "that the only reason for using 'becom[e] aware' rather than 'discover' was to differentiate between two notice requirements: one that applied to 'any' party to the contract that was the first to learn of a Material Breach (*i.e.*, the party to 'discover' it), and the separate and additional obligation of the Servicers to send a request to cure to the Seller 'upon becoming aware of' the breach – whether that awareness can be traced back to the Servicer's own 'discovery' or to notice it received from some other party that discovered the breach." SPA-36 (brackets in original). This reading improperly conflates "discovery" and "awareness." To the contrary, when contract drafters use different

The rules of contract interpretation thus require both that the difference between "discovery" and "awareness" be given meaning (to avoid surplusage), and that "awareness" must postdate "discovery" (to avoid absurdity).  This is accomplished by giving meaning to another difference in the language used in the sentences describing the notice of breach and request to cure provisions:  the different entities to which they are addressed.

The duty to give notice applies, as the District Court found, to "any party (which could be the Trustee, the Master Servicer, the Special Servicer or Morgan Stanley)."  SPA-28 (internal quotation marks omitted).  By contrast, a request to cure can be made only by the Servicers.  Putting this fact together with the facts that (1) discovery of breach must be communicated by the discovering party, and (2) awareness has to occur after discovery, leads to the conclusion that the

---

words, particularly in consecutive sentences in the same paragraph, they are presumed to intend different meanings.  *See NFL Enterprises LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008) ("The use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings." (internal citation omitted)); *Int'l Fid. Ins. Co. v. Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) ("Sophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning.").  For the reasons discussed in the text, this is the only sensible way to give meaning to the different time frames that apply to "discovery" as compared to "awareness."  Moreover, although three business days makes sense when measured from receipt of a notice of breach, which is a formal document, it does not make commercial sense to apply it to "discovery," which is not a date that is readily determinable by reference to a known and specified act such as a written notice.

29

Servicers become "aware of" a Material Breach upon receiving the notice of breach or, if the Servicer is the party that sends the notice of breach, at the time that notice is sent.

Three aspects of the Agreements confirm this interpretation. *First*, a request to cure is sent "upon becoming aware of *any such* . . . Material Breach," and the preceding sentence, *i.e.*, the referent for "*any such*," is the notice of breach sentence. JA-454 (MLPA §5(b)) (emphasis added). In other words, a request to cure is made for "any such . . . Material Breach" for which a notice of breach already has been given. Because requests to cure are only sent for breaches that have been noticed, the notice of breach must cause the "becoming aware" that leads to sending a request to cure.

*Second*, any other reading would lead to a commercially unreasonable result by limiting to three days the time period for considering whether to send a notice of breach. *See Lipper Holdings, LLC v. Trident Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (internal citations omitted)). In the circumstances of this case, the District Court's interpretation effectively eliminates the right of the Servicer, where it is the party that "discovers" a breach, to give notice thereof within a reasonable time ("promptly"). *See N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am.,*

30

*Inc.*, 599 F.3d 102, 116 (2d Cir. 2010) ("[T]he fundamental rule of contract interpretation [is] that a court must strive to give meaning to every sentence, clause, and word." (internal quotation marks omitted)).

The District Court recognized that three months was a reasonable period of time to investigate and consider an issue as weighty and complicated as the material breach of a securitized mortgage obligation. *See* SPA-37. No entity could make such an investigation in three days. However, once a "party" to the Agreements already has determined that a Material Breach has occurred, it is reasonable to expect the Servicers to make a cure request within three business days. In that situation, the Servicers rely on the investigation conducted by the "discovering" and "noticing" party (whether themselves or another party) and there is a formally documented date from which to calculate the three-business-day period.

*Third*, any other reading would create inexplicable inequities, as demonstrated by the following three hypotheticals. **Hypothetical 1:** On Day 1, the Trustee or Morgan Stanley "discover[s]" facts "suggesting that a [Material Breach] has occurred." SPA-34 (citation and internal quotation marks omitted). Under the Agreements, Morgan Stanley could investigate the potential breach and send a notice of breach on Day 30 (or a couple of months later, *see* SPA-37 ("three months is not *per se* unreasonable")), since that notice must merely be sent

31

"promptly" after "discover[y]." After receiving such a notice of breach and thus "becoming aware" of the breach, the Special Servicer would have until Day 33 to make a request to cure.

**Hypothetical 2:** Again on Day 1, the Special Servicer discovers facts suggesting that a Material Breach has occurred. Under the correct reading of the Agreements, the timeline is the same as in the first hypothetical; the Special Servicer could investigate thoroughly and send a "prompt[ ]" notice of breach on Day 30 (or later); it then would have until Day 33—an additional "three Business Days"—to make a request to cure. But under the District Court's erroneous reading, the Special Servicer would be (and was) required to send a notice of breach and a request to cure on Day 4 – *i.e.,* three business days after "discover[y]," but months before the notice of that discovery is due. Again, the District Court's reading of the contract effectively, and improperly, reads out the Servicer's right to a reasonable time to conduct an investigation and notice a breach, which violates the "fundamental rule of contract interpretation." *N.Y. Marine & General Ins. Co.*, 599 F.3d at 116.

**Hypothetical 3:** The Agreements provide that the "Master Servicer *shall*" and the "Special Servicer *may*" make a request for cure. JA-454. Here, the Special Servicer was the discovering party and gave prompt notice of a Material Breach to the other parties. This fulfilled its obligations as the discoverer of a

32

breach. If hypothetically the Special Servicer had done nothing more, then the Master Servicer would have been *required* to make a request for cure within three business days thereafter. This would have fulfilled the condition precedent under the District Court's logic. But the Master Servicer was relieved of that obligation because the Special Servicer already had requested cure. Again, it is nonsensical to conclude that the Special Servicer's request was late when the Master Servicer's request would have been timely three days later.

It follows that because the Special Servicer included in its notice of breach a request to cure, *see* JA-1277-79, the request to cure was necessarily timely. The Special Servicer sent prompt notice of discovery as a party to the PSA (and as the effective holder of rights under the MLPA) and this notice triggered the three-day period to send a request to cure. A simultaneous request to cure, therefore, was timely.

**Third**, regardless of the timeliness of the request to cure, such a request was not required in this instance because cure was impossible. The District Court's contrary statement is wrong. *See* SPA-30 ("Thus, for the purchaser of the Loan to force Morgan Stanley to repurchase the loan, notice to cure must be sent – even if, as was true in this case, the default cannot possibly be cured.").

As this court expressly held in *Giuffre Hyundai, Ltd. v. Hyundai Motor America*, 756 F.3d 204, 209 (2d Cir. 2014), "New York common law will not

33

require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless, or if the breach undermines the entire contractual relationship such that it cannot be cured."[19] *See id.* at 210 ("It would be patently unreasonable to require a franchisor to endure an incurable breach in service of an empty 'opportunity' to cure."); *Hicksville Mach. Works Corp. v. Eagle Precision, Inc.*, 635 N.Y.S.2d 300, 302 (2d Dep't 1995) (finding no opportunity need be provided where "there was no evidence in the record to support the proposition that a cure was possible"); *326-330 E. 35th St. Assoc. v. Sofizade*, 741 N.Y.S.2d 380, 381 (1st Dep't 2002) (per curiam) ("To insist upon the service of a formal notice to cure in such circumstances is to compel the performance of a useless and futile act." (applying a statutory notice requirement)). Accordingly, even if the Special Servicer's request to cure were not timely under the MPLA, the delay would be excused under the facts of this case because cure was impossible. *See* SPA-23, 30.

---

[19]  In *Giuffre*, this Court interpreted a New York state statute which allowed termination of a franchise agreement "if the [franchisee's] breach is not cured within a reasonable time after written notice of the breach." 746 F.3d at 209 (internal quotation marks and emphasis omitted). Thus, the Court upheld termination of the franchise agreement despite the fact that no request to cure was made (although notice of breach was given). *Id.* at 211. In this case, of course, both notice of breach and request to cure were sent.

### B. Sending a "Notice to Cure" Was Not a Condition Precedent to Morgan Stanley's Repurchase Obligation

"[A] contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition."  *See* SPA-29 (brackets in original) (quoting *Unigard Sec. Ins. Co. v. North Riv. Ins. Co.*, 79 N.Y.2d 576, 581 (1992)).  Put another way, conditions precedent "are not favored under New York law," so "in the absence of unambiguous language, a condition will not be read into [an] agreement."  *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1099-1100 (2d Cir. 1992).  In determining whether a particular agreement makes an event a condition, "doubtful language" must be interpreted as embodying a mere promise rather than a condition precedent.  *See Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691 (1995).

The Agreements contain no "unambiguous language" showing that the parties intended the making of a request to cure "within three Business Days" to be a condition precedent to Morgan Stanley's repurchase obligation.  The District Court's contrary conclusion is based not only on its fundamental misreading of the MLPA (*see* Point I.A, above), but also on its failure properly to employ the tools courts use to evaluate whether a contract term constitutes a condition precedent.

**Linguistic Conventions.**  Parties often use "linguistic conventions to create conditions precedent."  *Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir. 2008).  For

35

example, parties "often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' to make an event a condition." *Ginett*, 962 F.2d at 1100. Even when such words are used, however, they must be completely unambiguous in context to support finding a condition precedent.

Thus, in *LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868, 2003 WL 21671812 (S.D.N.Y. July 16, 2003), the notice provision stated that "[u]pon discovery" of a breach, the discovering party "shall give prompt written notice to each of the other parties." *Id.*, at *2 n.7 (internal quotation marks and brackets omitted). Yet the court determined that this was not a condition precedent that could excuse the defendant from repurchasing a loan, because "[a]lthough the prompt-notice provision starts with the word 'upon,' in this context it does not overcome the preference against finding conditions precedent." *Id.*, at *3.

Similarly, two recent decisions rejected claims that sending a notice of breach was a condition precedent to repurchase obligations because the language at issue did not explicitly say so. *See U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.*, No. 12 Civ. 9412, 2014 WL 3368670, at *7 (S.D.N.Y. July 9, 2014) ("Although a ninety day time period for Dexia to cure begins to run upon receiving written notice, nothing in the contract suggests that . . . notice is necessary to trigger a repurchase obligation or that the obligation is conditioned upon receiving

36

the notice."); *Ace Sec. Corp. Home Equity Loan Trust, Series 2007–HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, No. 13 Civ. 1869, 5 F. Supp. 3d 543, 562 (S.D.N.Y. 2014) (holding that a provision requiring a trustee to "promptly notify" the seller "and ask it to cure the breach or repurchase the loan within 60 days" is not a condition precedent because "[n]othing in the Agreements . . . expressly conditions [the seller's] repurchase obligation on receiving notice from the Trustee").

Like the agreements in *LaSalle Bank*, *Dexia* and *Ace Securities*, the MLPA lacks any linguistic conventions or other "clear" and "unambiguous language" showing that the parties "intended" the making of a request to cure to be a condition precedent. On the contrary, the sentence that imposes Morgan Stanley's repurchase obligation contains only one condition: ". . . if any . . . Material Breach cannot be corrected or cured in all material respects within" the 90-day cure period, Morgan Stanley "shall . . . repurchase" the loan. *See* p. 9, above. The repurchase obligation is otherwise unconditional. Absent "unambiguous language," the District Court could not properly find a condition precedent.

**Reviewing the Provision in Context.** "[C]lauses of a contract should be read together contextually in order to give them meaning." *Diamond Castle Partners IV PRC, L.P. v. IAC/InterActive Corp.*, 918 N.Y.S.2d 73, 75 (1st Dep't 2011) (internal quotation marks and citation omitted). Courts thus examine

contracts holistically to determine whether a particular provision was intended to operate as a condition. *See, e.g.*, *Israel*, 537 F.3d at 94. The District Court, however, viewed two paragraphs of the MLPA in isolation and thus overlooked other strong indications that the parties did not intend a request to cure to be a condition precedent to the repurchase obligation.

The MLPA and PSA contain other provisions that unambiguously operate as conditions precedent. Where a contract "expressly makes some requirements condition precedents [sic], such a fact will be taken into consideration in determining whether other provisions . . . are promises or conditions precedent." *Mackinder v. Schawk, Inc.*, No. 00 Civ. 6098, 2005 WL 1832385, at *6 (S.D.N.Y. Aug. 2, 2005). The following provisions in the Agreements demonstrate that, where the parties intended to create conditions precedent, they knew how to do so:

- "[T]he successor master servicer must assume all of the obligations of the terminated Master Servicer under the Primary Servicing Agreements ***as a condition precedent*** to its becoming Master Servicer hereunder." JA-264 (PSA §8.29(g) at 238) (emphasis added).

- "As promptly as reasonably practicable after receipt by any Certification Indemnitee . . . of notice of the commencement of any action, ***and as a condition precedent*** to the indemnification provided for in this Section 13.12, such Certification Indemnitee will . . . notify the applicable Indemnifying Party in writing of the commencement thereof." JA-341 (PSA §13.12 at 315) (emphasis added).

- "***[I]n the event that*** . . . the Mortgage loans . . . are held to be the property of the Seller, . . . then: (i) this Agreement shall be deemed to be a security agreement." JA-448 (MLPA §2 at 9) (emphasis added).

38

- "The Purchaser may exercise any of its rights hereunder through one or more designees or agents; ***provided*** the Purchaser has provided the Seller with prior notice of the identity of such designee or agent." JA-450 (MLPA §3 at 11) (emphasis added).[20]

**Inequitable Results.** *First*, the District Court's construction of the MLPA results in a substantial, disproportionate forfeiture to the Trust and investors despite the lack of any prejudice to Morgan Stanley resulting from the Special Servicer's alleged delay in making a request to cure. But "equity . . . abhors a windfall," particularly where rigid formality would produce an "unjust result" while a reasonable alternative interpretation would cause the objecting party to lose "nothing." *See Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989). Even if Appellant had made the request to cure in February 2009 (or earlier), for example (as the District Court said it should have), Morgan Stanley would have been in the exact same position as it is now, because cure was impossible. *Cf.* SPA-23, 30. Forfeiture of the Special Servicer's rights under the repurchase protocol is particularly inequitable because the "obligations of [Morgan

---

[20]  *See also, e.g.*, JA-456 (MLPA §5 at 17) ("[T]he Seller and the Purchaser hereby agree to modify . . . the related Mortgage Loan documents  . . .; ***provided that*** the Seller shall have furnished the Trustee . . . a nondisqualification opinion.") (emphasis added);  JA-459 (MLPA §6 at 20) ("The obligation of the Seller and the Purchaser to close ***shall be subject to the satisfaction of each of the following conditions*** on or prior to the Closing Date.") (emphasis added); JA-484 (MLPA, Sched. A-1, Rep. No. 25) ("The mortgage loan allows for a partial release ***subject to*** the satisfaction of certain tests and conditions set forth in the related loan documents."); JA-482 (MLPA, Sched. A-1, Rep. No. 4, Loan No. 299) ("The borrower has escrowed $15,000 to pay for the estimated costs of constructing a new drive way ***in the event that*** the easement is terminated.") (emphasis added).

39

Stanley] . . . to cure . . . a Material Breach or repurchase or replace a defective
Mortgage Loan constitute the sole remedies of the [Appellant]." JA-458 (MLPA
§5(b)). *See* Point II.C, above.

*Second*, the District Court's interpretation would make it virtually
impossible for the Special Servicer to comply with both its duty (a) to maximize
recovery for the investors, and (b) to act in good faith towards Morgan Stanley. It
is entirely appropriate that the Special Servicer perform an investigation and
confirm its suspicions that a Material Breach may have occurred before publicly
proclaiming that Morgan Stanley had made a false statement. Yet the District
Court's contract interpretation would force the Special Servicer to send a request to
cure immediately "upon becoming aware"—not of a Material Breach—but of even
the hint of such breach. *See* SPA-35 ("discovery" (which the court equates with
"becoming aware of," SPA-36) occurs "once [a party] has notice of the facts
suggesting a breach"). Thus, the District Court's interpretation would require the
Special Servicer to choose between (a) sending a potentially unfounded notice of
breach and request to cure (thereby potentially violating its duty of good faith to
Morgan Stanley); or (b) performing an investigation before sending a notice of
breach and request to cure (thereby forfeiting the Trust's sole remedy, *see* JA-458
(MLPA §5(b)), despite the Servicer's duty to act "in the best interests and for the
benefit of the [investors]" and to "maximiz[e] . . . the recovery of principal and

40

interest on [the] Mortgage Loan," *see* JA-103 (PSA §1.1 at 77)). The MLPA surely was not intended to entrap the Special Servicer in such an inequitable Catch-22.[21]

    *Finally*, the authorities cited by the District Court are not to the contrary. According to the District Court, *Assured Guaranty Mun. Corp. v. DB Structured Prods., Inc.*, 927 N.Y.S.2d 880, 887-88 (N.Y. Sup. Ct. 2011), "particularly" supports its determination that making a request to cure "within three Business Days" is a condition precedent. *See* SPA-31. That is because, in the District Court's view, the *Assured Guaranty* court "held" that "the sending of a notice to cure was a condition precedent to the repurchase obligation." SPA-31.

    The *Assured Guaranty* court did not so hold. *Assured Guaranty* did not address the existence of conditions precedent at all because it found that regardless of whether issuance of notice was a condition precedent, "Greenpoint fails to establish that DBSP did not provide the requisite notice." *Assured Guaranty*, 927 N.Y.S.2d at 895-96.

---

[21]   Indeed, the District Court's interpretation could lead to the perverse result of CMBS trustees and servicers issuing an avalanche of public notices of breach which, upon further investigation, turn out to be unsupported. A cautious trustee or servicer, which owes duties to investors, cannot risk the possible loss of multi-million dollar repurchase rights. This scenario could undermine the CMBS market, because both issuers like Morgan Stanley would appear untrustworthy (due to the frequent issuance of public notices that they failed to disclose material facts), as could trustees and servicers (who might have to withdraw most notices after investigation).

41

Moreover, the District Court fundamentally misread the contract at issue in *Assured Guaranty* in the same way it misread the MLPA: As here, the *Assured Guaranty* contract did not contain a "notice to cure" provision. Instead, the contract required the sending of a notice of breach. As is the case under the MLPA, the "cure period" in *Assured Guaranty* ran from the issuance of the notice of breach—not, as the District Court said, from a separate "notice to cure." *See Assured Guaranty*, 927 N.Y.S.2d at 897 n.15.

The District Court's reliance on *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09 Civ. 3106, 2011 WL 1135007, at *3, *6 (S.D.N.Y. Mar. 25, 2011) and *Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 Civ. 8613, 2002 WL 818082, at *4 (S.D.N.Y. Apr. 30, 2002), is equally misplaced. SPA-30-31. Neither of these decisions resolved whether a contractual notice requirement constituted a condition precedent to a defendant's repurchase obligation. The only issue in *Syncora* was whether a party was required to comply with a repurchase protocol as its exclusive remedy. *See* 2011 WL 1135007, at *5. In fact, the court explicitly listed the following "preconditions" to the plaintiff's "exercise [of] any of its rights": (a) "an Event of Default;" (b) the lack of a "Note Insurer Default;" and (c) the lack of "a different remedy expressly provided elsewhere." *Id.*, at *6. A notice requirement is conspicuously absent.

42

Similarly, the only relevant issue in *Bay View* was whether the plaintiff had provided defendant with "prompt notice" of breach. 2002 WL 818082, at *4. Under the agreement in *Bay View*, only the trustee had a duty to provide prompt notice. *See id.* But pursuant to the agreements here, Morgan Stanley independently promised to "promptly notify" the Special Servicer (among others) upon "discovering" a Material Breach. *See* p. 9, above.

Lastly, the District Court discussed three decisions which held that sending a notice of breach was not a condition precedent to the defendants' repurchase obligations. *See* SPA-31.[22] According to the District Court, those decisions involved agreements in which a defendant's repurchase obligation "was triggered in either of two situations—when the [defendant] received notice of the breach, or when [the defendant] discovered the breach of its own accord." SPA-31. As a result, sending a notice of breach was not a condition precedent to the repurchase obligation. *See* SPA-31. In the District Court's view, the MLPA is distinguishable because according to its terms, "only the sending of a notice to cure can trigger the 90-day period after which Morgan Stanley is obligated" to repurchase a loan. SPA-31-32.

---

[22] *See* SPA-31, *citing Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177, at *7 (S.D.N.Y. Oct. 11, 2005), *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868, 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003), and *Lehman Bros. Holdings Inc. v. Laureate Realty Servs., Inc.*, No. 1:04 Civ. 1432, 2007 WL 2904591, at *13 (S.D. Ind. Sept. 28 2007).

But, as discussed, the District Court misread the MLPA. The 90-day period is not triggered by the Special Servicer's making of a request to cure. Rather, the 90-day period begins upon Morgan Stanley's "receipt" of a notice of breach. *See* JA-454 (MLPA §5(b)). In addition, the MLPA contemplates that Morgan Stanley could be the party who initially "discover[s]" a Material Breach.[23] In such a scenario, the 90-day period would be triggered on the date Morgan Stanley "discover[s]" the breach.

Thus, the MLPA is in fact similar to the agreements in *Love Funding Corp.*, *LaSalle Bank* and *Laureate Realty Services*. The District Court erred in concluding that the MLPA was materially distinguishable from those agreements, and the request to cure is not a condition precedent to Morgan Stanley's repurchase obligation.

## II. EVEN IF THE REQUEST TO CURE WERE UNTIMELY, ITS DELAY DOES NOT EXCUSE MORGAN STANLEY'S REPURCHASE OBLIGATION

Even if this Court were to decide that the Special Servicer had not fulfilled the MLPA's notice of breach and request to cure requirements, Morgan Stanley

---

[23] *See, e.g.*, JA-454 (MLPA §5(b)) ("[I]f there is a breach of any of the representations and warranties required to be made by [Morgan Stanley] . . . the party discovering such . . . Material Breach shall promptly notify, in writing, the other party."); JA-455 (MLPA §5(b)) ("[S]uch repurchase or substitution must occur within 90 days from the earlier of the date [Morgan Stanley] discovered or was notified of the breach or defect.").

still must satisfy its repurchase obligation. *First*, Appellant's alleged breach was immaterial. *Second*, Appellant's performance has been substantial. *Finally*, even if making a request to cure within three days were a condition precedent, its performance should be excused because it would otherwise result in a forfeiture.

### A. The Special Servicer's Alleged Breach of the Notice and Cure Provisions Is Immaterial

"Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties" and be "so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (internal quotation marks omitted). To determine whether a party's breach rises to such a level, courts applying New York law look to the factors set forth in Section 241 of the Restatement (Second) of Contracts (the "Restatement"). *See id.*, *see also, e.g.*, *Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 562–63 (S.D.N.Y. 2014), *Encompass Ins. Co. of Am. v. English*, No. 11 Civ. 2606, 2013 WL 796309, at *5 (S.D.N.Y. Mar. 5, 2013); *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005). These factors unambiguously demonstrate that any alleged breach of the request to cure provision was immaterial.

45

**Deprivation of a Benefit.** The Restatement recognizes "the extent to which the injured party will be deprived of the benefit which he reasonably expected" as one of several factors which are "significant" to "determining whether a failure to render or to offer performance is material." Restatement §241(a).

The decision in *U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.*, No. 12 Civ. 9412, 2014 WL 3368670, at *7 (S.D.N.Y. July 9, 2014), exemplifies the manner in which this factor is applied. There, the contract provided that "promptly after receipt of [a notice of breach], the Master Servicer [or Special Servicer] shall request . . . that the applicable Mortgage Loan Seller, not later than ninety (90) days from the receipt of such written request . . . (i) cure such [breach] . . . [or] (ii) repurchase [ ] the affected Mortgage Loan . . . ." *Id.*, at *2. Finding that the "notice is, at most, 'a promise,'" the court held there was "no evidence [showing] how failure to give written notice of the breach . . . was material" because "nothing in the MLPA or PSA conditioned [the seller's] ability to cure on receiving written notice from the Trust"; and (2) "it [was] unclear what [the seller] could have done to cure [under] the circumstances." *Id.*, at *7, *7 n.92.

Similarly, in *Ace Securities*, the court found that "it would be premature . . . to conclude that Plaintiff's notice obligation was sufficiently material that any nonperformance of that obligation forecloses its ability . . . to enforce [the seller's] repurchase obligation" because "the Trustee's obligation to notify [the seller] of

46

breaches" was better "understood as a kind of promise . . . for the benefit of certificateholders" than as "an integral part of the repurchase protocol, which [the seller] bargained for and is entitled to rely upon." *Id.* at 563–64.

Any delay in Morgan Stanley's receipt of a request to cure did not deprive Morgan Stanley of any significant rights whatever. As in *Dexia*, there was nothing to preclude Morgan Stanley from curing its breach, if possible, prior to receiving notice from another party. Moreover, Morgan Stanley could not have cured its breach even if the Special Servicer had sent a request to cure in mid-February 2009 (when the District Court said it should have), because the breach was already incurable. *See* SPA-23, 30. Finally, as in *Ace Securities*, under the facts of this case, the MLPA's notice and cure provisions inure to the benefit of the certificate holders—not Morgan Stanley. *See* JA-454 (MLPA §5(a) ("[T]he Seller [Morgan Stanley] shall make for the benefit of the Trustee on behalf of the holders of the Certificates, . . . the representations and warranties," which include the Environmental Representation).

**Adequate Compensation.** Also relevant is "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived." Restatement §241(b). Since cure was impossible long before the Special Servicer began its investigation into the breach, Appellant's alleged failure to send a request to cure "within three Business Days" did not deprive Morgan

Stanley of any benefit; thus, there is no injury for which compensation need be considered. But even if Morgan Stanley had been deprived of some benefit, the "breach of the prompt written notice provision [would] at most give[ ] rise to a setoff against . . . the Trust[ee]." *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005).

**Forfeiture.** A finding of material breach is disfavored when "the party failing to perform or to offer to perform will suffer forfeiture." Restatement §241(c); *see* Point II.C, below. For example, in *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 846 N.Y.S.2d 95, 99 (1st Dep't 2007), a case involving mortgage securitization, the court rejected the seller's argument that the trustee's failure to provide timely notice "support[ed] the complete elimination of plaintiff's entitlement to damages" under a repurchase provision because "the record fail[ed] to establish that all financial injury caused [by the breach] would have been avoided" if plaintiff had sent prompt notice.

In the present case, a finding of materiality would cause the Trust and its certificate holders to suffer an enormous, disproportionate forfeiture – the loss of all principal and interest due under the $81 million City View Loan. By contrast, Morgan Stanley suffered no injury whatever from any alleged delay by the Special Servicer and thus would receive a windfall if the breach were deemed material.

48

**Likelihood of Cure and Duty of Good Faith.** "[T]he likelihood that the [breaching] party . . . will cure his failure" and "the extent to which the behavior of the [breaching] party . . . comports with standards of good faith and fair dealing" are the final Restatement factors. *See* Restatement §241(d), (e). Here, Appellant cured any alleged breach by providing a notice of breach and request to cure to Morgan Stanley on March 18, 2009, while Morgan Stanley suffered no prejudice due to any alleged delay. Finally, the Special Servicer acted in good faith; any hesitation on Appellant's part was due to its verifying the likelihood that a Material Breach had occurred and the necessity of obtaining the company president's approval before "putting essentially the world, including the rating agencies and all the certificate holders, on notice that [Morgan Stanley] ha[d] done something [it] shouldn't have done." JA-1821 (Pl.'s Opp. to Def.'s Supp. Summ. J. Ex. 5 (Crouch Dep.) at 114:8-24).

## B. Because the Special Servicer at least Substantially Performed Its Contractual Duties, Morgan Stanley Must Comply with Its Repurchase Obligation

The flip-side of analyzing Appellant's alleged breach is to analyze its performance. "[A] plaintiff's performance of other contractual promises must be merely 'substantial' before it can recover for a defendant's breach." *Ace Securities*, 5 F. Supp. 3d at 561; *cf. Dexia*, 2014 WL 3368670, at *5 (citing *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007))

49

("[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or [ ] where that party has committed a material breach."). In the context of securitization contracts, mortgage loan sellers must comply with their repurchase obligations where the trustee or servicer has substantially performed or, synonymously, has committed a breach that is not material.

For example, in *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate Inc.*, No. 02 Civ. 7868, 2003 WL 1461483 (S.D.N.Y. Mar. 21, 2003), the court found that "[the cure and repurchase] provisions expressly and explicitly impose obligations only on [the seller]" and "[i]n no way . . . state or imply an obligation on [the trustee's] part," where the contract stated the seller "*shall*" either cure or repurchase a mortgage loan "[w]ithin 90 days of the earlier of discovery or receipt of notice" of a default. *Id.*, at *6, *6 n.9 (emphasis in original). As noted above, p. 37, Morgan Stanley's repurchase obligation is similarly unconditional. And although the trustee in *LaSalle* "failed to give written notice of [the seller's] default for more than 2 years" after it learned about the default, the seller was entitled only to a counterclaim against the trustee.[24] *Id.*, at *7; *see Citicorp*, 2003 WL

---

[24] The relevant notice provision stated (much as section 5 of the MLPA at issue) that "[u]pon discovery by any of the parties hereto . . . of a [Material Breach], the party discovering such breach shall give prompt written notice to each of the other parties[.]" *LaSalle Bank Nat'l Ass'n*, 2003 WL 1461483, at *7.

50

21671812, at *3 (S.D.N.Y. July 16, 2003) ("[T]his Court already ruled that the prompt-notice provision gives rise to a separate claim rather than a defense.").

Similarly, the court in *Love Funding* found that the seller's obligation to cure or repurchase was "independent of its receipt of prompt written notice" and held that to the extent the trustee had failed to fully perform its promise to provide prompt notice, the proper result was a "setoff" of the seller's damages against its repurchase obligation. *Love Funding*, 2005 WL 2582177, at *7; *see Nomura*, 846 N.Y.S.2d at 99 (refusing to release the seller from its repurchase obligation and applying a mitigation of damages approach).

Like the contract in *Citicorp*, the MLPA provides that "[t]he Seller hereby covenants and agrees that . . . the Seller shall . . . repurchase the affected Mortgage Loan." JA-455 (MLPA §5(b)). But unlike the trustee in *Citicorp*, which delayed over two years after discovery before giving notice, the Special Servicer sent a notice of breach within two to four weeks of when the District Court said notice should have been given. *See* SPA-67. As in *Citicorp*, *Love Funding* and *Nomura*, the proper means to address the Special Servicer's alleged immaterial breach would have been for Morgan Stanley to file a counterclaim or to seek a reduction in damages—not to excuse Morgan Stanley from its repurchase obligation. Of course, Morgan Stanley did not seek damages here because it cannot possibly have suffered any loss from the Special Servicer's brief delay.

51

**C. Even if the Request to Cure Were a Condition Precedent, Delay Does Not Excuse Morgan Stanley's Repurchase Obligation**

The District Court held that Appellant "cannot rely on any purported failure of Morgan Stanley to demonstrate prejudice from late notice, because showing prejudice is not required where a condition precedent has not been satisfied." SPA-32. While literally true, this statement ignores black-letter law that prejudice is a factor to consider when determining materiality, and that if failure to comply with a condition precedent is immaterial and would result in disproportionate forfeiture, such failure is excused.

As Justice Cardozo recognized in a leading New York contract case, "an omission, both trivial and innocent, will sometimes be atoned for by allowance of the resulting damage, and will not always be the breach of a condition to be followed by a forfeiture." *Jacob & Youngs v. Kent*, 230 N.Y. 239, 241 (1921). Or, in more modern terms: "Strict application of the 25–day period as a condition precedent may also be excusable to avoid forfeiture. To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the nonoccurrence of that condition unless its occurrence was a material part of the agreed exchange." *Aeolus Down, Inc. v. Credit Suisse Int'l*, No. 10 Civ. 8293, 2011 WL 5570062, at *1 (S.D.N.Y. Nov. 16, 2011) (internal quotation marks and citation omitted); *see Mount Sinai Hosp. v. 1998 Alexander Karten Annuity Trust*, 970 N.Y.S.2d 533, 541–42 (1st Dep't 2013) ("While a court may

52

excuse the non-occurrence of a condition precedent to avoid causing

disproportionate forfeiture to the party that would otherwise lose a part of what it

expected to receive, forfeiture in that context means the denial of compensation

that results when the obligee loses its right to the agreed exchange after it has

relied substantially, as by preparation or performance on the expectation of that

exchange." (internal citations, quotation marks, and brackets omitted)); *CFIP*

*Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 455-56 (S.D.N.Y. 2010)

(noting the "well-established doctrine of forfeiture, whereby to the extent that the

non-occurrence of a condition would cause disproportionate forfeiture, a court may

excuse the non-occurrence of that condition unless its occurrence was a material

part of the agreed exchange" (internal quotation marks and brackets omitted));

Restatement §229 ("To the extent that the non-occurrence of a condition would

cause disproportionate forfeiture, a court may excuse the non-occurrence of that

condition unless its occurrence was a material part of the agreed exchange.").

Here, the forfeiture that would be suffered by investors in the Trust if the

three business days condition were enforced would be unquestionably

"disproportionate." The forfeiture is the complete loss of $81 million in principal

amount of the City View Loan, plus interest. And the cause of that forfeiture is a

notice to cure that, according to the District Court, was approximately two to four

weeks late, *see* SPA-67, notwithstanding that (1) the notice of breach was timely;

53

(2) the time-frame for the repurchase obligation runs from the notice of breach; and

(3) the breach was incurable long before any of the relevant events occurred.  As a result and as the analysis in Point II.A makes evident, Morgan Stanley cannot claim that delay in sending the request to cure deprived it of "a material part of the agreed exchange."  *See CFIP Master Fund, Ltd.*, 738 F. Supp. 2d at 467 ("'The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman and every slip was fatal.'" (quoting *Wood v. Duff-Gordon*, 222 N.Y. 88, 91 (1917) (Cardozo, J.))).

Thus, even if the Court were to conclude both that sending a request to cure was a condition precedent to Morgan Stanley's repurchase obligation, and that the Special Servicer's request to cure was untimely, Morgan Stanley would still be required to repurchase the Loan because Appellant's failure to satisfy the condition precedent must be excused in light of its vastly disproportionate impact.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should reverse the District Court's

judgment dismissing the Special Servicer's complaint and remand for trial.

March 4, 2015                                  Respectfully submitted,

<u>/s/ David A. Barrett</u>
David A. Barrett
Joshua J. Libling
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Ave
New York, NY 10022
Telephone:   (212) 446-2300
Facsimile:   (212) 446-2350

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,696 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

March 4, 2015

/s/ David A. Barrett
David A. Barrett
Joshua J. Libling
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Ave
New York, NY 10022
Telephone:   (212) 446-2300
Facsimile:   (212) 446-2350

# ADDENDUM

## Excerpts from MLPA and PSA

# Mortgage Loan Purchase Agreement dated May 1, 2007 ("MLPA")

Section 5.    Remedies Upon Breach of Representations and Warranties Made by the Seller.

\* \* \* \*

(b)    It is hereby further acknowledged that if any document required to be delivered to the Custodian on behalf of the Trustee pursuant to Section 2 is not delivered as and when required (and including the expiration of any grace or cure period), is not properly executed or is defective on its face, or if there is a breach of any of the representations and warranties required to be made by the Seller regarding the characteristics of the Mortgage Loans and/or the related Mortgaged Properties as set forth in Exhibit 2 hereto, and in either case such defect or breach, either (i) materially and adversely affects the interests of the holders of the Certificates in the related Mortgage Loan, or (ii) both (A) the document defect or breach materially and adversely affects the value of the Mortgage Loan and (B) the Mortgage Loan is a Specially Serviced Mortgage Loan or Rehabilitated Mortgage Loan (such a document defect described in the preceding clause (i) or (ii), a "Material Document Defect" and such a breach described in the preceding clause (i) or (ii) a "Material Breach"), the party discovering such Material Document Defect or Material Breach shall promptly notify, in writing, the other party; provided that any breach of the representation and warranty contained in paragraph (38) of such Exhibit 2 shall constitute a Material Breach only if such prepayment premium or yield maintenance charge is not deemed "customary" for commercial mortgage loans as evidenced by (i) an opinion of tax counsel to such effect or (ii) a determination by the Internal Revenue Service that such provision is not customary.  Promptly (but in any event within three Business Days) upon becoming aware of any such Material Document Defect or Material Breach, the Master Servicer shall, and the Special Servicer may, request that the Seller, not later than 90 days from the Seller's receipt of the notice of such Material Document Defect or Material Breach, cure such Material Document Defect or Material Breach, as the case may be, in all material respects; provided, however, that if such Material Document Defect or Material Breach, as the case may be, cannot be corrected or cured in all material respects within such 90-day period, and such Material Document Defect or Material Breach would not cause the Mortgage Loan to be other than a "qualified mortgage" (as defined in the Code), but the Seller is diligently attempting to effect such correction or cure, as certified by the Seller in an Officer's Certificate delivered to the Trustee, then the cure period will be extended for an additional 90 days unless, solely in the case of a Material

1

Document Defect, (x) the Mortgage Loan is, at the end of the initial 90-day period, a Specially Serviced Mortgage Loan and a Servicing Transfer Event has occurred as a result of a monetary default or as described in clause (ii) or clause (v) of the definition of "Servicing Transfer Event" in the Pooling and Servicing Agreement and (y) the Material Document Defect was identified in a certification delivered to the Seller by the Trustee pursuant to Section 2.2 of the Pooling and Servicing Agreement not less than 90 days prior to the delivery of the notice of such Material Document Defect. The parties acknowledge that neither delivery of a certification or schedule of exceptions to the Seller pursuant to Section 2.2 of the Pooling and Servicing Agreement or otherwise nor possession of such certification or schedule by the Seller shall, in and of itself, constitute delivery of notice of any Material Document Defect or knowledge or awareness by the Seller of any Material Document Defect listed therein.

The Seller hereby covenants and agrees that, if any such Material Document Defect or Material Breach cannot be corrected or cured in all material aspects within the above cure periods, the Seller shall, on or before the termination of such cure periods, either (i) repurchase the affected Mortgage Loan or REO Mortgage Loan from the Purchaser or its assignee at the Purchase Price as defined in the Pooling and Servicing Agreement, or (ii) if within the two-year period commencing on the Closing Date, at its option replace, without recourse, any Mortgage Loan or REO Mortgage Loan to which such defect relates with a Qualifying Substitute Mortgage Loan. If such Material Document Defect or Material Breach would cause the Mortgage Loan to be other than a "qualified mortgage" (as defined in the Code), then notwithstanding the previous sentence, such repurchase or substitution must occur within 90 days from the earlier of the date the Seller discovered or was notified of the breach or defect. The Seller agrees that any substitution shall be completed in accordance with the terms and conditions of the Pooling and Servicing Agreement.

      * * * *

2

# Pooling and Servicing Agreement dated May 1, 2007 ("PSA")

Section 2.3.    Repurchase of Mortgage Loans for Material Document Defects and Material Breaches of Representations and Warranties.

(a)    If any party hereto discovers that any document or documents constituting a part of a Mortgage File has not been delivered as and when required (and including the expiration of any grace or cure period), has not been properly executed, or is defective on its face or discovers or receives notice of a breach of any of the representations and warranties relating to the Mortgage Loans required to be made by a Seller regarding the characteristics of the Mortgage Loans and/or related Mortgaged Properties as set forth in the related Mortgage Loan Purchase Agreements, and in either case such defect or breach either (i) materially and adversely affects the interests of the holders of the Certificates in the related Mortgage Loan, or (ii) both (A) the document defect or breach materially and adversely affects the value of the Mortgage Loan and (B)the Mortgage Loan is a Specially Serviced Mortgage Loan or Rehabilitated Mortgage Loan (such a document defect described in the preceding clause (i) or (ii), a "**Material Document Defect**," and such a breach described in the preceding clause (i) or (ii), a "**Material Breach**") such party shall give prompt written notice to the other parties hereto and to each Rating Agency subject to the terms of the applicable Mortgage Loan Purchase Agreement.  Promptly (but in any event within three Business Days) upon becoming aware of any such Material Document Defect or Material Breach, the applicable Master Servicer shall, and the Special Servicer may, request that the related Seller, not later than 90 days from such Seller's receipt of the notice of such Material Document Defect or Material Breach, cure such Material Document Defect or Material Breach, as the case may be, in all material respects; provided, however, that if such Material Document Defect or Material Breach, as the case may be, cannot be corrected or cured in all material respects within such 90-day period, and such Material Document Defect or Material Breach would not cause the Mortgage Loan to be other than a "qualified mortgage" (as defined in the Code) but the related Seller is diligently attempting to effect such correction or cure, as certified by such Seller in an Officer's Certificate delivered to the Custodian on behalf of the Trustee, then the cure period will be extended for an additional 90 days unless, solely in the case of a Material Document Defect, (x) the Mortgage Loan is at the end of the initial 90 day period a Specially Serviced Mortgage Loan and a Servicing Transfer Event has occurred as a result of a monetary default or as described in clause (ii) or clause (v) of the definition of "Servicing Transfer Event" and (y) the Material Document Defect was identified in a certification delivered to the Seller by the Custodian on behalf

3

of the Trustee pursuant to Section 2.2 not less than 90 days prior to the delivery of the notice of such Material Document Defect. The parties acknowledge that neither delivery of a certification or schedule of exceptions to a Seller pursuant to Section 2.2 or otherwise nor possession of such certification or schedule by the Seller shall, in and of itself, constitute delivery of notice of any Material Document Defect or knowledge or awareness by the Seller of any Material Document Defect listed therein. Notwithstanding anything herein to the contrary, any breach of the representation and warranty contained under the heading "Prepayment Premiums" in Exhibit 2 to each Mortgage Loan Purchase Agreement with respect to any Mortgage Loan shall constitute a Material Breach only if such prepayment premium or yield maintenance charge is not deemed "customary" for commercial mortgage loans at the time of origination, as evidenced by (i) an opinion of tax counsel to such effect or (ii) a determination by the Internal Revenue Service that such provision is not customary. In addition, if such Mortgage Loan is modified so that it becomes a Qualifying Substitute Mortgage Loan, such breach shall be deemed cured and the related Seller will not be obligated to repurchase such Mortgage Loan or otherwise remedy such breach. The related Seller is required to pay for any expenses incurred by the applicable Master Servicer or the Special Servicer in connection with such modification.

If any such Material Document Defect or Material Breach cannot be corrected or cured in all material respects within the above cure periods, the related Seller that is the subject of such Material Breach shall be obligated, not later than the last day of such permitted cure period, to (i) repurchase the affected Mortgage Loan or REO Mortgage Loan from the Trust at the applicable Purchase Price in accordance with the related Mortgage Loan Purchase Agreement, or (ii) if within the two-year period commencing on the Closing Date, at the related Seller's option, replace, without recourse, such Mortgage Loan or REO Mortgage Loan with a Qualifying Substitute Mortgage Loan. If such Material Document Defect or Material Breach would cause the Mortgage Loan to be other than a "qualified mortgage" (as defined in the Code), then notwithstanding the previous sentence, the repurchase or substitution must occur within 90 days from the earlier of the date the related Seller discovered or was notified of the breach or defect.

* * * *

4

**Special Appendix**

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Judgment, entered June 17, 2014 .............................. SPA-1

Decision and Order, dated June 19, 2013 .................. SPA-2

Memorandum Decision and Order Granting
   Defendant's Supplemental Motion for Summary
     Judgment, dated June 16, 2014 ............................ SPA-53

SPA-1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
THE BANK OF NEW YORK MELLON TRUST
COMPANY, NATIONAL ASSOCIATION,
TRUSTEE FOR THE REGISTERED CERTIFICATE
HOLDERS OF COMMERCIAL MORTGAGE
PASS-THROUGH CERTIFICATES SERIES
2007-IQ14, ACTING BY AND THROUGH C-111
ASSET MANAGEMENT LLC, AS
SPECIAL SERVICER,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/17/2014

                              Plaintiffs,                        11 **CIVIL** 505 (CM) (GWG)

          -against-                                                   **JUDGMENT**

MORGAN STANLEY MORTGAGE CAPITAL, INC.,
                              Defendant.
-----------------------------------------------------------------X

Currently before the Court is Morgan Stanley's supplemental motion for summary judgment,

which it made after this Court's June 2013 order granting a motion to reopen discovery, and the

matter having come before the Honorable Colleen McMahon, United States District Judge, and the

Court, on June 16, 2014, having rendered its Memorandum Decision and Order granting Morgan

Stanley's supplemental motion for summary judgment, and directing the Clerk of the Court to close

this file, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Decision and Order dated June 16, 2014, Morgan Stanley's supplemental

motion for summary judgment is granted and the case is closed.

**Dated:** New York, New York
        June 17, 2014

**RUBY J. KRAJICK**
**Clerk of Court**

BY: _____

**Deputy Clerk**

**THIS DOCUMENT WAS ENTERED**
**ON THE DOCKET ON** _____

SPA-2

UNITED STATES DRISTIC COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

THE BANK OF NEW YORK MELLON TRUST
COMPANY, NATIONAL ASSOCIATION, TRUSTEE
FOR THE REGISTERED CERTIFICATE HOLDERS
OF MORGAN STANLEY CAPITAL I INC.,
COMMERCIAL MORTGAGE PASS-THROUGH
CERTIFICATES SERIES 2007-IQ14, ACTING BY
AND THROUGH C-III ASSET MANAGEMENT LLC,
AS SPECIAL SERVICER,

                                    Plaintiff,

          v.

MORGAN STANLEY MORTGAGE CAPITAL, INC.,

                                    Defendant.
————————————————————————x

| USDS SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 6/19/2013 |

No. 11 Civ. 0505 (CM)(GWG)

## DECISION AND ORDER

McMahon, J.:

This is an action about commercial mortgage-backed securities. It concerns the loss in value of one of the mortgage loans backing a multi-billion dollar securities offering. The Bank of New York Mellon Trust Company, National Association ("Bank of New York," "Trustee," or "Plaintiff"), the Trustee for investors in those securities, sues Morgan Stanley Mortgage Capital, Inc. ("Morgan Stanley" or "Defendant"), the originator of the mortgage loan, for breach of several representations and warranties made to the investors regarding the nature and quality of that loan.

The parties have filed cross-motions for summary judgment. Morgan Stanley asserts that it is entitled to summary judgment on the grounds that (1) the Trustee waived its rights to sue under the representations because, prior to securitization, Morgan Stanley disclosed to the

1

Trustee the very facts underlying the alleged breaches of the representations and (2) the Trustee did not provide timely notice of the alleged breaches as required by the terms of the relevant contract. The Trustee, on the other hand, asserts that it is entitled to summary judgment on its claims that Morgan Stanley breached two express representations and warranties, constituting a "Material Breach" of the contract.

Morgan Stanley also brings a motion to preclude or, in the alternative, to reopen discovery. It asks the Court to either (1) preclude the Trustee from arguing that it gave timely notice upon its discovery of the alleged breaches because it has refused to produce documents to support its claim that it discovered the breaches on a particular date, citing the attorney-client privilege, or (2) allow Morgan Stanley to have discovery of the alleged communications the Trustee had with counsel.

For the reasons that follow, Morgan Stanley's motion for summary judgment is granted in part and denied in part; summary judgment is granted to Plaintiff on Morgan Stanley's defense of waiver; and Plaintiff's motion for summary judgment is denied. Morgan Stanley's motion to reopen discovery or preclude is granted.

## BACKGROUND[1]

### I. The Parties

Plaintiff Bank of New York represents the certificate holders, or investors, in a commercial mortgage-backed securities offering. Specifically, Bank of New York is trustee for the registered certificate holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates Series 2007-IQI4 (the "Trust"), acting by and through C-III Asset Management LLC, as Special Servicer ("C-III Asset Management" or "Special Servicer").

---

[1] The facts herein are drawn from the parties' Local Rule 56.1 statements of undisputed material facts. Any material disputes of fact are so indicated. To the extent any other facts are disputed, the dispute is not material to the Court's ruling on this motion.

2

Defendant Morgan Stanley is the originator of the mortgage loans backing the above securities offering.

## II. The Facts

### A. The Mortgage Loan and the Securitization Process

The mortgage loan at issue was made in connection with the purchase of a retail shopping center in Garfield Heights, Ohio (the "Mortgaged Property" or the "City View Center"), which included a Wal-Mart store as one of the "anchor" stores of the center. The property is built on top of two former landfills.

On December 26, 2006, Morgan Stanley issued the mortgage loan (the "Mortgage Loan" or the "Loan") in the amount of $81 million to City View Center, LLC ("City View"), pursuant to a written Loan Agreement (the "Loan Agreement"). In conjunction with the Mortgage Loan, City View purchased the shopping center from Garfield Land Development, LLC ("Garfield"), securing the Loan with the Mortgaged Property.

Morgan Stanley then securitized the Loan, along with other loans, as part of a pool. As part of the securitization process, Morgan Stanley sold the Loan, together with other commercial loans, to a special purpose vehicle, Morgan Stanley Capital I Inc. ("MS Capital"), pursuant to a Mortgage Loan Purchase Agreement, dated as of May 1, 2007 (the "MLPA"). (*See* Pl.'s Summ. J., Ex. 2 (hereinafter "MLPA").) The MLPA specifies that the Agreement "shall be governed by and construed in accordance with the internal laws and decisions of the State of New York." (MLPA § 14, at P033657.)

The Mortgage Loan and other loans were then pooled together in a trust to be securitized. Pursuant to a Pooling and Servicing Agreement (the "PSA"), also dated May 1, 2007, MS Capital deposited the Mortgage Loan (and the other loans) into a trust designated Morgan

3

**SPA-5**

Stanley Capital I Trust 2007- Iq14 (the "Trust"). (*See* Pl.'s Summ. J., Ex. 3 (hereinafter "PSA").) The Trust was created under and pursuant to the PSA, on May 1, 2007, to hold the loans for the benefit of certificate holders (*i.e.*, investors). The Trust then issued certificates to MS Capital, which sold the certificates to an underwriter for eventual sale to the investors.

The "Closing Date" of the MLPA and the PSA was May 30, 2007. The transactions that closed on this date included the sale of the Mortgage Loan to MS Capital, the deposit of the Loan into the Trust, and the securitization of the loans.

In addition to creating the Trust, the PSA designated a Trustee to administer the loans and appointed a "Master Servicer" and a "Special Servicer" (together, the "Servicers") for the loans deposited in the Trust. Plaintiff Bank of New York is the current Trustee. The PSA appointed Wells Fargo Bank, National Association ("Wells Fargo") as Master Servicer and Centerline Servicing, Inc. ("Centerline") as the Special Servicer. On May 10, 2010, C-III Asset Management LLC ("C-III Asset Management") succeeded Centerline as the Special Servicer, and it remains the current Special Servicer. The Court refers to Centerline and C-III Asset Management interchangeably as the "Special Servicer." In general, the Master Servicer services loans while they are performing, and the Special Servicer services non-performing loans, or loans that have defaulted. The Special Servicer's formal duties usually begin when the loan is "transferred" to it by the Master Servicer after a default on the loan.

Before the securitization, the Mortgage Loan was serviced by an "interim servicer," ARCap Servicing, Inc. ("ARCap"), retained by Morgan Stanley. ARCap is the predecessor entity to Centerline (ARCap became Centerline at some point prior to securitization), but its role as "interim servicer" was distinct and separate from Centerline's role as Special Servicer. It is not clear when the "interim servicer" role ceased and the "Special Servicer" role began –

whether the relevant cut-off date was May 1, 2007, when the MLPA and the PSA were executed, or May 30, 2007, the Closing Date. While the PSA identifies ARCap as the "former" Special Servicer to the loans and designates Centerline as the "Special Servicer," neither party gives a date for when the "interim servicer" role for ARCap/Centerline ended.

In order to screen the Loan for placement in the Trust and prepare for securitization of the loans, Morgan Stanley provided various files and documents related to the Mortgage Loan to ARCap as the "interim servicer." The record does not reflect whether any such files were provided to ARCap/Centerline in its capacity as "Special Servicer" in the time period between May 1, 2007, when it may have assumed some of its "Special Servicer" responsibilities, and May 30, 2007, when the securitization closed, and more importantly, the effective date of the representations and warranties, which is important to the discussion below. The parties (Morgan Stanley in particular) fail to make clear when and to whom many of the documents relevant to this litigation were disclosed. The pertinent documents are discussed in more detail below.

In addition, prior to securitization, and before it was appointed Special Servicer, employees at Centerline reviewed certain files related to the Mortgage Loan. Centerline's parent company, C-III Capital Partners LLC, was evaluating whether to make an investment in a "B-piece investor" in the Trust, and Centerline conducted due diligence on its behalf. A "B-piece investor" is the investor that takes a "first loss" position in the riskiest class of certificates issued in the certification, and it generally conducts its own due diligence on the mortgage loans before investing in a mortgage-backed securities offering. C-III Capital Partners LLC invested and became a minority shareholder of the B-piece investor. (Def.'s Summ. J., Ex. 11, Wilkicki Dep. at 137:11-138:13, 141:7-10, 152:1-155:20 & Ex. 15.) It is undisputed that, prior to securitization, Jennifer Wilkicki and Jeff Row, employees of Centerline, and Paul Smyth, the

5

COO of C-III Capital Partners LLC and the President of Centerline, participated in the review of mortgage documents so that C-III Capital Partners LLC could decide whether to invest in the B-piece investor. (Def.'s Summ. J., Ex. 11, Wilkicki Dep. at 159:8-160:17.) That review took place in or around March 2007. What those documents were will be described below.

On May 30, 2007, The Trustee signed separate powers of attorney giving the Master Servicer and the Special Servicer the authority, "To perform any and all acts which may be necessary or appropriate" to enable each Servicer "to service and administer the Mortgage Loans (as defined in the Pooling and Servicing Agreement) in connection with the performance" of their duties as Servicer. (Def.'s Summ. J., Exs. 7, 8.) Subject to written consent of the Trustee, the powers of attorney also granted each Servicer the ability to initiate any action, suit, or proceeding as representative of the Trustee. (*Id.*)

**B. The Relevant Representations and Warranties and Contract Provisions**

In the MLPA, Morgan Stanley made certain representations and warranties "for the benefit of the Trustee on behalf of the holders of the Certificates." (MLPA § 5(a), at P033648.) Although the Trustee is not a party to the MLPA, these representations and warranties, as well as certain other rights assigned to MS Capital by the MLPA, were assigned to the Trustee through the PSA. Defendant contends that the representations and warranties at issue in this case were made as of the Closing Date of May 30, 2007, and Plaintiff appears to agree. I thus deem that fact stipulated for the purposes of the present motions.

The Trustee claims that Morgan Stanley breached two of those representations.

**1. The "Environmental Representation"**

The first is Representation 12(i) of the MLPA (the "Environmental Representation"), which states that Morgan Stanley had "no knowledge of any material and adverse environmental

condition or circumstance affecting [the Property] that was not disclosed in [the Environmental Report]." (MLPA Ex. 2, Representation 12(i).)

The "Environmental Report" referred to in the representation was a "Phase I industry standards" environmental site assessment that was prepared by IVI Due Diligence Services Inc. (hereinafter the "IVI Report"). The parties agree that this is the only report upon which the environmental representation and warranty is based.

### 2. The "No Material Default Representation"

The second representation is Representation 27 (the "No Material Default Representation"), which states that to Morgan Stanley's knowledge, "there exists no material default, breach, violation or event of acceleration (and no event which, with the passage of time or giving of notice, or both, would constitute any of the foregoing) under the documents evidencing or securing the Mortgage Loan, in any such case to the extent that same materially and adversely affects the value of the Mortgage Loan and the related Mortgage Property . . . " (MLPA Ex. 2, Representation 27.)

By this provision, Morgan Stanley warranted that, to its knowledge, there was no "material default" of the Loan Agreement between Morgan Stanley and City View.

The Loan Agreement includes a representation made by City View that "there are no defaults [under the Leases identified on Schedule I . . .] by either party," which includes the lease for the Wal-Mart store. (Def.'s Summ. J., Ex. 1, Warranty 3.1.22, at P006304.) The Loan Agreement also includes a provision that an "event of default" under the Loan Agreement occurs "if any representation or warranty made by [City View] herein . . . shall have been false or misleading in any material respect as of the date the representation or warranty was made." (*Id.* Section 10.1, at P006349-P006351.)

### 3. Other Relevant Contract Provisions

Section 3 of the MLPA also provides that Morgan Stanley shall deliver to the "Purchaser," *inter alia*, various files related to the mortgage loans included in the Trust. It also states:

> The fact that the Purchaser has conducted or has failed to conduct any partial or complete examination of the credit files, underwriting documentation or Mortgage Files for the Mortgage Loans shall not affect the right of the Purchaser or the Trustee to cause the Seller to cure any Material Document Defect or Material Breach (each as defined below), or to repurchase or replace the defective Mortgage Loans pursuant to Section 5 of this Agreement.

Section 5(b) of the MLPA includes the following provision regarding breach of any of the representations and warranties. It defines "Material Breach," and outlines the notice requirements and Morgan Stanley's obligations when any such breach occurred:

> . . . if there is a breach of any of the representations and warranties required to be made by the Seller [Morgan Stanley] regarding the characteristics of the Mortgage Loans and/or the related Mortgaged Properties as set forth in Exhibit 2 hereto, and in either case such defect or breach, either (i) materially and adversely affects the interests of the holders of the Certificates in the related Mortgage Loan, or (ii) both (A) the document defect or breach materially and adversely affects the value of the Mortgage Loan and (B) the Mortgage Loan is a Specially Serviced Mortgage Loan or Rehabilitated Mortgage Loan (such a document defect described in the preceding clause (i) or (ii), a "Material Document Defect" and such a breach described in the preceding clause (i) or (ii) a "Material Breach"), the party discovering such Material Document Defect or Material Breach shall promptly notify, in writing, the other party; . . . Promptly (but in any event within three Business Days) upon becoming aware of any such Material Document Defect or Material Breach, the Master Servicer shall, and the Special Servicer may, request that the Seller, not later than 90 days from the Seller's receipt of the notice of such Material Document Defect or Material Breach, cure such Material Document Defect or Material Breach, as the case may be, in all material respects; . . .
>
> The Seller hereby covenants and agrees that, if any such Material Document Defect or Material Breach cannot be corrected or cured

8

> in all material aspects within the above cure periods, the Seller
> shall, on or before the termination of such cure periods, either (i)
> repurchase the affected Mortgage Loan . . . from the Purchaser or
> its assignee at the Purchase Price as defined in the Pooling and
> Servicing Agreement, or (ii) if within the two-year period
> commencing on the Closing Date, at its option replace, without
> recourse, any Mortgage Loan . . . to which such defect relates with
> a Qualifying Substitute Mortgage Loan.

In other words, if there is a Material Breach of a performing loan, the Master Servicer "shall" (must) ask the Seller to cure the Breach in all material respects within 90 days.

If there is a Material Breach of a non-performing loan, the Special Servicer "may" (but need not) ask the Seller to cure the Breach in all material respects within 90 days.

If any Material Breach *cannot* be cured in all material respects within 90 days, then Morgan Stanley has to repurchase the loan. It is this obligation that Plaintiff insists Morgan Stanley has breached.

Section 2.3 of the PSA reiterates the notice requirements of the MLPA with respect to the parties' discovery of a breach of any representations and warranties, and any obligations of Morgan Stanley to repurchase the Loan.

**C. The Wal-Mart Store**

The City View shopping center was built on top of two former municipal solid waste landfills. The Ohio Environmental Protection Agency (the "Ohio EPA") regulated the initial construction of the property and continued to supervise the property – before and after it was purchased by City View in December 2006 – under a "Rule 13 Authorization," related to landfill usage. (*See* Pl.'s Summ. J., Ex. 5 (the "IVI Report") at MSMC0048413.) The regulations are intended to limit and control the exposure of harmful landfill gas, a major component of which is methane. Methane is a flammable and explosive substance, and it was the Ohio EPA's "primary concern" related to the property.

9

Prior to building on the property, in order to control and prevent the migration of methane into the buildings, a "clay cap" was constructed on top of the waste material and a flexible membrane liner was installed underneath the concrete slabs of the buildings, as required by the Ohio EPA. (*Id.*) Methane sensors and alarms were also installed in the buildings and structures on the property, as well as a "gas extraction system" (also referred to as a "methane venting system"), which could remove methane from beneath the structures, if necessary. (*Id.*)

The regulations also required the site's "environmental consultant," McCabe Engineering, to submit weekly reports to the Ohio EPA regarding the site. (*Id.*)

Prior to the date of securitization, May 30, 2007, the Ohio EPA issued several "notices of violation" ("NOVs") regarding various issues at the property that required follow-up, including maintenance of erosion channels, repair of a floor slab, and off-site capping operations. (*See id.*) The estimated cost of addressing these violations was approximately $115,000 - $125,000. (*Id.*; Def.'s Summ. J., Ex. 22 (the "Asset Summary Report") at P033475.)

As early as October 2006, the Wal-Mart store allegedly began having problems with the leakage of methane gas in and around the store. As recounted in more detail below, Wal-Mart reported on various occasions that methane alarms and sensors had detected methane at the "floor ports," "floor drains," and in the ambient air in the store. Methane levels are generally described in terms of the "lower explosive level" or "LEL."

**1. October 31, 2006 Detection of Methane**

On October 31, 2006, the Garfield Heights Fire Department ("GHFD") responded to a methane alarm at the Wal-Mart store and discovered levels of methane at 100% of the lower explosive level in the ambient air within the store. (Pl.'s Summ. J., Ex. 4, ¶¶ 37, 40.)

## 2. December 2006 Closure of the Wal-Mart Store

For two days, from December 5-7, 2006, Wal-Mart closed its store, citing as the reason the detection of methane levels above 100% of the lower explosive level in the store.

On December 14, 2006, counsel for Wal-Mart, Kenneth Kreider, sent a notice of default (the "first notice of default") to Garfield, the owner of the property at the time. (Pl.'s Summ. J., Ex. 8.) In the letter, Kreider explained that "elevated and unsafe levels of methane were detected within the Wal-Mart store as a result of a failure of the Venting System [] to adequately remove methane from the underlying soils and vent it to the atmosphere in a safe manner," causing the two-day closure. (*Id.*) The letter cited Garfield's "failure to deliver a fully effective and operational Venting System," as a default under the lease, and indicated that Wal-Mart would withhold installments of rent until the default was cured, as permitted under the lease. (*Id.*) Wal-Mart also wrote, "The default is materially and adversely affecting Wal-Mart's ability to conduct normal business operations." (*Id.*) Morgan Stanley was not an addressee on and did not receive this letter.

In a memorandum dated December 6, 2007, counsel for Garfield, Gregg Levy, summarized the issues related to the Wal-Mart closing. (Def.'s Opp'n Ex. 15.) This memorandum was received by Morgan Stanley. Garfield described Wal-Mart's decision to close the store as a "unilateral decision," not prompted by the fire department. (*Id.*) He wrote, "Wal-Mart admitted that it was erring on the side of caution, and nothing indicates a threat of safety to person or property." (*Id.*) He further explained that Garfield believed the issue was not with the methane venting system, but with the connections from the floor drains to the sanitary sewer. According to Garfield, the cast iron piping at the Wal-Mart store was causing the pipes to

SPA-13

separate, thus letting sewer gas escape from the sanitary sewer and enter the separated pipes and the buildings. (*Id.*)

On December 28, 2006, Wal-Mart provided Morgan Stanley and City View with a "tenant estoppel certificate," affirming various modifications to the Wal-Mart lease and stating in pertinent part:

> The Lease has been modified and is in full force and effect as written.
>
> . . .
>
> Methane was detected in the store at levels above 100% of the lower explosive level, which required temporary closure of the store for two days from December 5-7, 2006. There is no conclusive determination to date as to the cause of the methane in the store. Wal-Mart reserves its rights and remedies under the Lease, including, but not limited to, its right to withhold or abate rent to address damages incurred by Wal-Mart that have arisen from the situation.

(Pl.'s Summ. J., Ex. 9 (the "Wal-Mart Estoppel").)

Also on December 28, 2006, Garfield and Wal-Mart entered into a letter agreement whereby Garfield agreed to a "lease warranty undertaking" in connection with the methane gas intrusion at the store in November (presumably the October 31 intrusion) and December 2006. (Pl.'s Summ. J., Ex. 10.) In the letter, Garfield referred specifically to the two-day closure of the Wal-Mart store due to methane levels above 100% of the lower explosive level and noted that "to date" there was no conclusive determination as to the cause of the methane in the store. (*Id.*)

The letter described Wal-Mart's claims as for repairs to the "sewer piping system, specifically the connections from the floor drains to the p-traps and the p-traps to the main sewer system." (*Id.*) According to Garfield, the problems were caused by "the mechanical fernco adapters necessary to connect the drain body to the cast iron pipes [which] failed and became

dislodged, [] causing sewer gases to emanate into the buildings." (*Id.*) Garfield acknowledged that, as warranty repairs, these were the responsibility of the landlord, and agreed to make the necessary repairs to all of the floor drains.

Morgan Stanley also received a copy of Garfield's lease warranty undertaking, which was enclosed with the Wal-Mart Estoppel sent to it on December 28, 2006.

### 3. Alleged Methane Incidents, January through May, 2007

On January 3, 2007, Alemko, a jointly-appointed monitoring company, detected elevated levels of methane above 100% of the lower explosive level at a floor drain in one of the store's restrooms.

On January 8, 2007, counsel for Wal-Mart wrote to both Garfield and City View, reporting the January 3 incident and giving Wal-Mart's "second notice of default" under the lease. (Pl.'s Summ. J., Ex. 11.) Morgan Stanley was not sent and did not receive this letter.

On February 23, 2007, Wal-Mart wrote to City View to complain of additional methane-related problems, stating in pertinent part:

> I want to reiterate there are numerous structural problems at the [Wal-Mart store] resulting most notably in spiking levels of methane intrusion in our store. . . . [M]ethane was detected at the floor drains in the pharmacy water closet and water heater closet, . . . [and] the cap in the pharmacy drain appears to be cracked and is allowing methane to enter our store.
>
> Another issue is that [*sic*] the Hub drain for the walk-in Freezer and Cooler condensate line. We believe that the transition from the vertical condensate pipe to the drain hub coming from below slab requires a code-mandated air gap. The putty that has been placed at that transition does not appear to comply. . . .
>
> At this point it appears the past attempts at remediation are not working and this causes us concern. These structural issues underlying the methane intrusion into our store need to be remedied immediately.

(Pl.'s Summ. J., Ex. 12, at MSMC0048923.)

On February 28, 2007, Levy, counsel for Garfield, wrote to Wal-Mart outlining the repairs Garfield would make as part of the "lease warranty undertaking" of December 2006. (Def.'s Opp'n, Ex. 32.)  The letter states that over thirty repairs were made to various floor drains, and that according to Alemko, "there have been consistent zero readings on all repaired floor drains.  While I have been made aware of a few positive readings at some floor drains, I have been told by my experts that those are simply the users failing to clear their meters from past readings . . ." (*Id.*)  It further states, "the methane venting system is working appropriately." (*Id.*)  Levy acknowledged that there continued to be positive methane readings at floor ports, but expressed that such readings are normal and expected for a property built on a landfill.  (*Id.*)  According to Levy, the methane exhaust system was supposed to detect some levels of methane and then make adjustments based on those readings.  (*Id.*)

Additionally, Levy wrote that he believed the reference in the February 23, 2007 letter, above, to "structural issues" at the Wal-Mart store was inaccurate.  He wrote, "[T]here are no known structural issues regarding your store.  If this sentence is referring to any subgrade ground settling or subsiding, this is not a structural failure nor issue, as this is how the Shopping Center was designed; the Shopping Center is built on piles for the exact reason that settling and subsiding is to occur." (*Id.*)

Levy further indicated that the only repairs that remained to be completed were to the condensate line in the freezer unit, referred to in the February 23 letter.  (*Id.*)

On March 7, 2007, the February 23 and February 28 letters were emailed to Ivan Yee at Morgan Stanley by Kristin Esser, who worked at Coral Asset Management, LLC, a management company retained by City View.  (Def.'s Opp'n, Ex. 32.)  A third email, sent the same day,

indicated that another problem with a cracked plug had been fixed as well. (Def.'s Opp'n, Ex. 33.)

On March 27, 2007, Kreider, counsel for Wal-Mart, sent a "third notice of default" to City View, citing both the poor performance of the sewer piping system and the methane extraction system. (Pl.'s Summ. J., Ex. 13.) He reported that, according to "Wal-Mart's consultant," positive methane readings continued at several floor drains, even after the above repairs, and that any temporary fixes to the floor drains were also not working. (*Id.*) Further, water infiltrating the methane extraction system was causing higher methane readings at floor ports. (*Id.*)

Kreider noted that the "pipes continue to separate and sag," and suggested that the cause of the drain problems was either due to improper installation of the pipes or damage in the construction process, combined with ongoing settlement of the soil underneath the property. (*Id.*)

Morgan Stanley was not sent and did not receive the March 27 letter.

Alemko and Hull Inc., two companies that performed monitoring of the floor drains and floor ports for Wal-Mart, did not detect any methane at the floor drains in the period between the February 23 letter and the March 27 letter. (Def.'s Opp'n, Exs. 16-22.)

On April 6, 2007, Wal-Mart wrote to Esser, manager of the Mortgaged Property on behalf of City View: "Every day this week methane has been detected at [the Wal-Mart] store. . . . At this point it appears that the past attempts at remediation are not working and this causes us concern." (Pl.'s Summ. J., Ex. 14.)

Morgan Stanley was not sent and did not receive the April 6 letter.

Alemko and Hull Inc. did not detect any methane at the floor drains in the several weeks prior to this letter.  (Def.'s Opp'n, Exs. 20-22.)

### 4. Post-Securitization Methane Problems and the Departure of Wal-Mart

After the Mortgage Loan was securitized in May 2007, problems with methane at the Wal-Mart store increased.  The settling of waste material underlying the property, which had contributed to some of the problems that Wal-Mart experienced prior to the securitization, became more severe and caused methane to enter storm drains and sewers at various points on the property.

In December 2007, a methane fire erupted in the storm sewer at the Mortgaged Property. (Pl.'s Summ. J., Ex. 17.)

The Ohio EPA issued additional notices of violations on March 18 and June 18, 2008. (Pl.'s Summ. J., Ex. 18.)  The U.S. Environmental Protection Agency ("EPA") and the Agency for Toxic Substances and Disease Registry ("ATSDR") were also enlisted to help OEPA analyze underground methane gas generation at the property.  (Pl.'s Summ. J., Ex. 19.)

On July 7, 2008, at the behest of the Ohio EPA, the Ohio Attorney General filed a suit against City View and Garfield, among other defendants.  (Pl.'s Summ. J., Ex. 20.)  The complaint alleged that the defendants had failed "to prevent the migration of landfill gas" and sought civil penalties of up to ten thousand dollars for each day of each violation.  (*Id.*)  The suit eventually settled; Garfield agreed to make major infrastructure improvements to the property and to pay a $1.2 million civil penalty.  (*Id.*)

On September 15, 2008, Wal-Mart closed its store, citing various methane-related problems in a letter to City View dated September 18, 2008.  (Pl.'s Summ. J., Ex. 16.)

In a letter dated September 10, 2008 to Wal-Mart, City View counsel stated "To our knowledge, there have been no recent methane intrusion issues within the Premises." (Def.'s Opp'n, Ex. 56.) In a September 18, 2008 letter to a property manager of City View Center, the director of the Ohio EPA attempted to allay concerns voiced by other tenants of the shopping center raised by Wal-Mart's departure. (Def.'s Opp'n, Ex. 65.) The director wrote, "I have reiterated many times that as long as the remedial measures are being performed, City View Center is safe." (*Id.*) He explained that Wal-Mart never discussed any environmental or structural concerns with him or his staff, and that the departure came as a surprise to the Ohio EPA. (*Id.*) Finally, on October 26, 2008, the Garfield Heights Fire Department wrote a letter to the Mayor and City Council members, confirming that "Since the opening of City View Center, there has been only one [] methane alarm activated due to methane gas. The incident occurred at Wal-Mart on October 31, 2006." (Def.'s Opp'n, Ex. 11.)

On January 30, 2009, Wal-Mart terminated its lease, citing damage and defects related to settlement of the landfill underlying the property and methane gas intrusions in the store, among other things. (Pl.'s Summ. J., Ex. 21.)

## D. The IVI Report

The IVI Report, which underlay the Environmental Representation, disclosed the following about the environmental conditions on the Mortgaged Property.

"This assessment has revealed no evidence of recognized environmental conditions in connection with the [Mortgaged Property] and no further investigation is currently recommended." (Pl.'s Summ. J., Ex. 5, at MSMC0048413.) The report identifies as an "item of environmental concern" that the Mortgaged Property was a former landfill site. (*Id.*)

The report further states that the property:

> . . . is operating under the supervision of the Ohio EPA under "Rule 13 Authorization," which pertains to landfill usage. In addition, . . . weekly reports are required to be submitted to the Ohio EPA and the site will meet the closure requirements under Rule 13, which includes capping the landfill and installing a methane gas extraction system.
>
> A gas extraction system was installed beneath the current improvements. The structures were designed with methane sensors, alarms and a gas extraction system to remove methane from beneath the structures, if necessary.
>
> In addition, IVI was provided with an undated document from Pinnacle Financial Group, Inc. entitled *Rough Order of Magnitude (ROM) Estimate for Addressing Items Identified in Agency NOD/NOV Letters.* The document itemized eight items that required further action: such as maintenance of erosion channels; covering of exposed waste; repair of a floor slab; some off-site capping operations; and passive vent installation, and a cost estimate associated with the item. Of note, the areas of exposed waste and the passive venting system are not on the Subject. The total dollar amount listed for addressing the on-site items was $115,000. IVI recommends continued compliance with regulatory requirements as well as monitoring of the methane gas extraction system.

(*Id.*)

The IVI Report, dated July 25, 2006, was based in part on a site visit IVI conducted of the Mortgaged Property on July 14, 2006. The report was initially prepared not for Morgan Stanley, but for another prospective lender who was thinking about whether to lend money to City View for the purchase of the property. The report was later re-issued to Morgan Stanley with respect to Morgan Stanley's scope of work.

Cover emails from IVI to Morgan Stanley suggest that the report was "updated" in some fashion on or about January 12, 2007, and again on March 19, 2007, and that Morgan Stanley received what it claims is the "final" updated report on or about March 19, 2007. (Def.'s Opp'n, Exs. 25, 26.)

ARCap received a copy of one version of the report from Morgan Stanley on January 20, 2007. (Def.'s Summ. J., Ex. 33.) Centerline acknowledges receiving a copy of some version of the report (which version is not specified) prior to or at closing of the securitization. (*See* Def.'s Summ. J., Ex. 6.) Wilkicki of Centerline acknowledged that "C-III" first received the report as part of the due diligence file it reviewed when C-III Capital Partners LLC was deciding whether to invest in the B-piece prior to May 2007. (Def.'s Summ. J., Ex. 11, Wilkicki Dep. at 144:13-20.)

The report's summary of the document titled "Rough Order of Magnitude (ROM) Estimate for Addressing Items Identified in Agency NOD/NOV Letters" suggests that at the time the report was written, there may have been at least some outstanding NOVs from the Ohio EPA. The report summarizes some of the items included in the purported NOVs and the associated cost to cure those items. But in another section of the IVI Report, Section 4.6 at P000382, it states (confusingly) that Karen Naples, an Environmental Specialist with the Ohio EPA, "stated there are no outstanding violations at the [property]."

The Trustee disputes Morgan Stanley's contention that the Report included updated and comprehensive information regarding all outstanding NOVs prior to the securitization. The parties agree that the Report does not contain any particularized reference to any of the specific methane-related incidents that occurred at the Wal-Mart store between October 2006 and May 2007, when the transaction closed.

**E. Transfer of the Mortgage Loan to Special Servicing and the Trustee's Notices of Material Breach**

By July 21, 2008, Wells Fargo, the Master Servicer, had learned of the Ohio EPA lawsuit filed against City View and Garfield.

On August 21, 2008, Wells Fargo, citing the Ohio EPA complaint, sent City View a "notice of default" under the Loan Agreement, based on City View's failure to complete certain "environmental work" related to the sanitary sewer system and methane system at the Wal-Mart premises. (Def.'s Summ. J., Ex. 26.) The notice gave City View thirty days to "cure" any defaults, to the extent a cure period was provided for in the Loan Agreement. (*Id.*)

In September 2008, Wells Fargo informed Centerline of the pending Ohio EPA lawsuit and indicated that it believed a default on the Loan Agreement by City View was "imminent or likely to occur within 60 days." (Def.'s Summ. J., Ex. 27.)

Wells Fargo and Centerline both learned of the closure of the Wal-Mart store on the day of the closure, September 15, 2008.

On November 8, 2008, City View defaulted on a payment that was due on the Loan. (Def.'s Summ. J., Ex. 11, Wilkicki Dep. 29:2-6, 228:4-11.) On November 12, 2008, Wells Fargo transferred the Loan to Centerline for special servicing, giving as the reason that "imminent default of the loan is anticipated (cure not likely within 60 days)." (Def.'s Summ. J., Ex. 30.) Thus, on November 12, 2008, the Loan became a "Specially Serviced Mortgage Loan," as that term is defined in the MLPA.

After receiving the Loan for special servicing, Centerline began an investigation into potential breaches of the representations and warranties made by Morgan Stanley in the MLPA. The investigation was worked on by Wilkicki and Row – the very same people who had participated in the B-piece investor due diligence prior to securitization, and who therefore had access to the "Asset Summary Report" of the Mortgage Loan, dated March 19, 2007. Wilkicki acknowledged reviewing the document as part of that diligence. (Def. Summ. J., Ex. 11, Wilkicki Dep. at 71:13-75:21.) That document included the following information:

> The gas extraction is in working order and is in compliance with the Ohio EPA, however, the Ohio EPA had issued several Notices of Violation to the Seller regarding various issues with a total estimated cost to cure of associated with the subject collateral of approximately $125,000.
>
> . . . .
>
> In December 2006, elevated methane was detected in the Wal-Mart store. After a two-day closure of the Wal-Mart, it was determined that the source of the methane was a broken sewer pipe below the store. Reparations have been made and follow-up testing shows no detectable methane gas. In February 2007, Wal-Mart notified the property manager of alleged continued methane gas intrusions however, the methane gas venting systems are working appropriately and testing continues to show no detectable methane.

(Def.'s Summ. J., Ex. 22, at P033475.)

On February 16, 2009, Wilkicki drafted a memorandum in which she said, the Special Servicer (Centerline) "believes it has discovered a Material Breach of [Morgan Stanley's] Representations and Warranties" – specifically, the Environmental Representation. (Def.'s Summ. J., Ex. 32.) The memorandum itself does not indicate who, if anyone, it was addressed to, but according to Wilkicki, it was prepared for senior management at Centerline. (*Id.*; Pl.'s Opp'n, Wilkicki Decl. ¶ 33.) The memorandum asserts that Morgan Stanley breached the representation because, prior to securitization, it "was aware of material and adverse environmental conditions and circumstances affecting the Mortgaged Property that were not disclosed in the [IVI Report]." (Def.'s Summ. J., Ex. 32.) In relevant part, Wilkicki asserted that Morgan Stanley's "Closing Counsel Transaction Summary," dated in or around January 2007, demonstrated that Morgan Stanley was aware of numerous "notices of violation" issued by the Ohio EPA related to the Mortgaged Property and the adjoining properties, which went unresolved for years, formed the basis of the Ohio EPA lawsuit, and eventually led to the

departure of Wal-Mart as an anchor tenant. (*Id.*) Morgan Stanley initially provided the Closing

Counsel Transaction Summary to ARCap on January 5, 2007. (Def.'s Summ. J., Ex. 3.)

   The MLPA provided that Centerline, the Special Servicer, may send a request to cure to

Morgan Stanley no later than three business days after discovering a Material Breach.

Nonetheless, despite this memorandum – in which a Centerline employee specifically states that

by February 16, 2009 Centerline had discovered the facts underlying a breach of a representation

and warranty – the Trustee asserts that the Special Servicer did not become "aware" of the

Material Breach until a month later, on March 16, 2008, during discussions with its counsel.

   Two days later, on March 18, 2009, Centerline sent its "First Notice of Material Breach"

(or "First Notice") to Morgan Stanley, alleging that Morgan Stanley breached the Environmental

Representation, based on the Closing Counsel Transaction Summary and the numerous "notices

of violations" discussed therein that purportedly were not disclosed by the IVI Report. (Def.'s

Summ. J., Ex. 3.)

   The First Notice included a "Request for Cure." (*Id.*) Centerline asserted that the breach

was a Material Breach, demanded that the breach be cured within the 90 days prescribed by the

PSA and the MLPA, and reiterated the language in the MLPA providing that "If the Material

Breach cannot be corrected or cured in all material respects within the applicable cure period(s),

[Morgan Stanley] shall be obligated, not later than the last day of the cure period to [] repurchase

the Mortgage Loan from the Trust." (*Id.*) Obviously, since the representation and warranty had

been breached (if it was breached) back in 2007, there was no way to cure it.

   Almost two months later, on May 11, 2009, Morgan Stanley responded to the First

Notice, writing only that it disagreed with Centerline's "characterization of the facts and

circumstances" and that it intended "to vigorously defend its underwriting and disclosures made in the PSA and the Mortgage Loan." (Pl.'s Opp'n, Ex. H.)  It did not repurchase the Loan.

No lawsuit was filed at that time.

It is undisputed that all facts about the City View loan were known to the Special Servicer by the time the First Notice of Material Breach was filed.  Nonetheless, a year and a half later, Duval & Stachenfeld LLP ("D&S") – the Trustee's counsel in the present action – allegedly "discovered" a second Material Breach of the MLPA:  namely, that Morgan Stanley had breached the No Material Default Representation by making that representation at the time of the securitization, even though it knew that City View had defaulted under its lease with Wal-Mart, which constituted a default under the Loan Agreement.  The Trustee asserts that D&S first became "aware" of this breach on September 21, 2010.  Three days later, on September 24, 2010, the Special Servicer issued the "Second Notice of Material Breach" (or the "Second Notice"), alleging additional facts demonstrating a breach of the Environmental Representation, as well as alleging a breach of the No Material Default Representation.  (Def.'s Summ. J., Ex. 6.)

In the Second Notice, the Special Servicer cited various documents in support of its assertion, including the following documents of relevance:  (1) the Wal-Mart Estoppel (dated December 28, 2006), described in Section C above; (2) the December 28, 2006 letter agreement between Garfield and Wal-Mart regarding Garfield's "lease warranty undertaking," described in Section C above; (3) a December 26, 2006 letter agreement also between Garfield and Wal-Mart, regarding methane gas monitoring; and (4) a letter dated December 29, 2006, from City View's counsel, Joseph M. Reidy, to Morgan Stanley, which stated that, on December 18, 2006, City View had received copies of three "additional NOVs" related to the Mortgaged Property dated November 11, November 21, and November 22, 2006. (*See id.*)  Prior to securitization, Morgan

SPA-25

Stanley provided each of these four documents to "C-III" – a term it conveniently defines as including ARCap (the interim servicer) as well as the Special Servicer (initially Centerline, and subsequently C-III Asset Management).  On the record before me I cannot tell which entity received the documents prior to securitization.

The Second Notice also included a "Request for Cure or Repurchase."  C-III Asset Management demanded that Morgan Stanley either cure the alleged breaches within 90 days of the notice or repurchase the Loan, as required under the MLPA.  (*Id.*)

Ninety days later, on December 22, 2010, Morgan Stanley responded to the Second Notice.  Again it disagreed with the Special Servicer's "characterization of the facts and circumstances" of the alleged breach and reiterating its intention to defend its underwriting and disclosures.  (Pl.'s Opp'n, Ex. I.)  Morgan Stanley also alleged, for the first time, that both the First and Second Notices were untimely under the MLPA, because the Special Servicer did not give "prompt written notice . . . ( . . . within three Business Days)," as required by the contract. (*Id.*)

### III.  Issues on Plaintiff's Motion for Summary Judgment

The Trustee moves for summary judgment on both of its claims.

It argues that Morgan Stanley breached the Environmental Representation because, as a matter of undisputed fact, it was aware of "material and adverse environmental conditions" at the Mortgaged Property that were not disclosed in the IVI Report.

It also contends that Morgan Stanley breached the No Material Default Representation because the Wal-Mart Estoppel, dated December 28, 2006 – which Morgan Stanley admittedly received – establishes that City View (which had represented to Morgan Stanley that there were

no material defaults under the Wal-Mart lease) was, in fact, in "material" default under the Wal-Mart lease by virtue of the seepage of methane gas into the store.

The Trustee argues that both misrepresentations constituted a "Material Breach" of the MLPA, because the Mortgage Loan is a "Specially Serviced Mortgage Loan" and the breaches "materially and adversely affected[ed] the value of the Mortgage Loan."

## IV.  Issues on Morgan Stanley's Motion for Summary Judgment and Motion to Preclude or, in the Alternative, to Reopen Discovery

Morgan Stanley cross moves for summary judgment.

First, it argues the entire case should be dismissed because both the First and Second Notice were sent more than three days after the Special Servicer became aware of the breaches.

Second, Morgan Stanley contends that the Trustee waived its right to assert any breach of warranty by Morgan Stanley because, prior to securitization, Morgan Stanley disclosed to the trustee – or, rather, to someone Morgan Stanley characterizes as the Trustee's "agent" – the very same facts on which the Trustee now relies to make its claim.

Morgan Stanley has also asked this Court either to (1) allow it to reopen discovery so that it can review attorney-client communications that relate to exactly when the Special Servicer "knew" about the alleged breaches of warranty, or (2) preclude the Trustee from relying on attorney-client communications to establish the date of when it "knew" about the breaches.  I will discuss this motion in the context of Defendant's argument that the notices to cure were untimely.

### DISCUSSION

There are so many genuine issues of material fact in this case that it would be easy simply to say so and proceed to trial.  However, a few issues can and should be addressed now.

## I.  Standard of Review

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 247–48 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

A court may search the record and grant summary judgment to any party, even a nonmoving party, when it is entitled to judgment and will not suffer procedural prejudice as a result.

"The prevailing view in this Circuit is that a court need not give notice of its intention to enter summary judgment against the moving party." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991). "It is most desirable that the court cut through mere outworn procedural niceties and make the same decision as would have been made had [the non-moving party] made a cross-motion for summary judgment." *Id.* (quoting *Local 33, Int'l Hod Carriers Bldg. & Common Laborers' Union of Am. v. Mason Tenders Dist. Council of Greater N.Y.*, 291 F.2d 496, 505 (2d Cir.1961)). The key question for the Court to ask in doing so is whether the facts are fully developed so that the moving party suffers no procedural prejudice. *Id.* The threat of procedural prejudice is greatly diminished where the Court rules only on issues "identical to those raised by the moving party." *Id.*

## II.  Defendant's Motion for Summary Judgment on the Ground of Untimely Notice is Granted in Part and Denied in Part; Defendant's Motion to Reopen Discovery is Granted

### A.  The Notice Requirement in the MLPA

The MLPA requires that notice of any Material Breach be given "promptly" after "any party" (which could be the Trustee, the Master Servicer, the Special Servicer, or Morgan Stanley) learns of the Material Breach. (MLPA § 5(b).) The PSA further provides that such notice must be given to the applicable Rating Agency for the Loan. (PSA § 2.3(a), at MSMC 0021335.)

Additionally, for loans that are in default and are no longer being serviced by the Master Servicer, the Special Servicer "may" send a request to cure to Morgan Stanley "Promptly (but in any event within three Business Days) upon becoming aware of" a Material Breach. (MLPA § 5(b).) If such breach "cannot" be cured within a 90 day "cure period" that begins on the date

SPA-29

notice is sent, Morgan Stanley must repurchase the Loan.[2]  Repurchase is the only alternative remedy for a Material Breach available after May 30, 2009.  (*Id.*)

Morgan Stanley argues that the Special Servicer's obligation to send a notice to cure within three business days after learning of a Material Breach was a condition precedent to Morgan Stanley's obligation to repurchase a Mortgage Loan that "cannot" be cured (within the cure periods).

The Trustee, on the other hand, argues that sending a notice to cure was not a condition precedent.  In particular, it contends that the Special Servicer was not obligated to send a "request to cure" for breaches, like here, that "cannot" be cured.

I conclude that sending a notice to cure within three business days was a condition precedent to the repurchase obligation.

"Under New York law, a condition precedent is an act or event which must occur before another party's duty to perform its promise arises."  *LaSalle Bank Nat. Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 21671812 (S.D.N.Y. July 16, 2003).  "To make a provision in a contract a condition precedent, it must appear from the contract itself that the parties intended the provision so to operate."  *Torres v. D'Alesso*, 80 A.D.3d 46, 57-58 (N.Y. 2010) (quoting 22 N.Y. Jur. 2d, Contract § 262).  "[A] contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition."  *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 N.Y.2d 576, 581 (N.Y. 1992).  The "interpretive preference" favoring construction of contractual language as embodying a promise or a constructive condition rather than an express condition, however, "cannot be employed if the occurrence of the event as a condition is expressed in unmistakable language, or where the event is within the obligee's control or the circumstances indicate that it

---

[2] The cure period may be extended by the parties, but that fact has no relevance here.

28

has assumed the risk." *Nat'l Fuel Gas Distribution Corp. v. Hartford Fire Ins. Co.*, 814

N.Y.S.2d 436, 437 (2006) (internal quotations and alterations omitted).

Here, the contract by its terms only requires Morgan Stanley to buy back a loan if a

Material Breach "cannot" be cured within a defined "cure period" – 90 days after a notice to cure

is sent.  While the Special Servicer is not required to send a notice to cure – the language

provides that it "may" send such a request – sending a notice to cure is required to trigger the

running of the 90 day period within which the Loan must be repurchased (if cure cannot be

effected within 90 days).  Thus, for the purchaser of the Loan to force Morgan Stanley to

repurchase a loan, notice to cure must be sent – even if, as was true in this case, the default

cannot possibly be cured.  As the agreement is written, sending the notice to cure is tantamount

to demanding that the loan be repurchased.  It is true, as Plaintiff argues, that the law prefers

interpreting a contractual condition as a promise or constructive condition, rather than a

condition precedent.  But here, since sending a notice to cure is unmistakably required to trigger

the cure period and the buyback obligation, such a preference is inapplicable.  *See, e.g.*, *Nat'l*

*Fuel Gas Distribution Corp. v. Hartford Fire Ins. Co.*, 814 N.Y.S.2d 436, 437 (N.Y. 2006).

It may seem silly to require a notice to cure to be sent when cure is impossible; Plaintiff

argues as much.  But the language of the buyback provision, which depends for its force on

whether the breach "can" be cured *within the cure periods* (*i.e.*, 90 days or as otherwise provided

in the contract),[3] makes abundantly clear that the parties agreed on a condition precedent to the

buyback obligation:  the sending of a notice to cure and the inability to cure within 90 days after

the sending of that notice.

In cases involving securitized mortgage loans, courts have repeatedly treated similar

notice provisions as conditions precedent to the enforcement of a loan seller's repurchase

---

[3] No one has pointed to any otherwise applicable provision.

obligations. *See, e.g.*, *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 09 Civ. 3106

(PAC), 2011 WL 1135007, at *3, 6 (S.D.N.Y. Mar. 25, 2011); *Morgan Guar. Trust Co. of New*

*York v. Bay View Franchise Mortgage Acceptance Co.*, No. 00 Civ. 8613 (SAS), 2002 WL

818082, at *4 (S.D.N.Y. Apr. 30, 2002).  Particularly, in *Assured Guaranty Municipal Corp. v.*

*DB Structured Products, Inc.*, 927 N.Y.S.2d 880 (N.Y. Sup. Ct. 2011), the court held that the

sending of a notice to cure was a condition precedent to the repurchase obligation, where the

repurchase provision stated, similar to here, that "if such breach cannot be cured, [the seller]

shall, at [the purchaser's] option, repurchase such Revolving Credit Loan at the Repurchase Price

within two (2) Business Days *following the expiration of the related cure period*." *Assured*

*Guar. Mun. Corp.*, 927 N.Y.S.2d at 887-88 (emphasis added).

        In contrast, in other cases involving securitized mortgage loans, courts have declined to

find that a notice to cure was a condition precedent where the repurchase obligation was

triggered in either of two situations -- when the seller received notice of the breach, or when it

discovered the breach of its own accord.  *Trust for Certificate Holders of Merrill Lynch Mortg.*

*Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, 32005 WL 2582177, at *7

(S.D.N.Y. 2005) (provision required cure or repurchase "within sixty (60) days of *either*

*discovery by* or notice to [Seller] of any Breach of a representation or warranty") (emphasis in

original); *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, 2003 WL 21671812, at *3

(S.D.N.Y. 2003); *Lehman Bros Holdings Inc. v. Laureate Realty Services, Inc.*, 2007 WL

2904591, at *13 (S.D. Ind. 2007) (applying New York law).  Those courts reasoned that the

obligation was independent of the seller's receipt of timely notice because the repurchase

obligation could also arise upon the seller's own discovery of a breach.  That is not the case here,

where only the sending of a notice to cure can trigger the 90-day period after which Morgan

Stanley is obligated to buy back a loan that "cannot" be cured within that time period.  And,

unlike in *LaSalle Bank National Ass'n*, where the court concluded the notice requirement was

not a condition precedent to the repurchase obligation, here the repurchase provision "expressly

refer[s]" back to the notice to cure, making it dependent on that notice.  *Cf. LaSalle Bank Nat.*

*Assoc.*, 2003 WL 21671812, at *3 ("Moreover, although the cure-or-repurchase and the prompt-

notice provisions both involve notice, the two do not expressly refer to each other.")

       The Trustee cannot rely on any purported failure of Morgan Stanley to demonstrate

prejudice from late notice, because showing prejudice is not required where a condition

precedent has not been satisfied.  *See Constitution Reins. Corp. v. Stonewall Ins. Co.*, 980 F.

Supp. 124, 130-31 (S.D.N.Y. 1997); *see also Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 79

N.Y.2d 576, 578, 581 (N.Y. 1992).  *Unigard*, cited by the Trustee, does not support its position.

The Second Circuit has explicitly recognized that the default rule set in *Unigard* for reinsurance

contracts – that for a reinsurer to be relieved from its indemnification obligations because of the

reinsured's failure to provide timely notice, it must show prejudice resulted from the delay –

applied only "absent an express provision in the contract making prompt notice a condition

precedent."  *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 273

(2d Cir. 1992) (interpreting the holding of *Unigard*).

       Neither is Morgan Stanley, as the Trustee asserts, required to demonstrate that the delay

in notice was itself a "material" breach of the contract.  Here, the notice provision operates as a

condition precedent, not a duty.  Thus, cases like *Toyomenka Pacific Petroleum, Inc. v. Hess Oil*

*Virgin Islands Corp.*, 771 F. Supp. 63, 68 (S.D.N.Y. 1991) – which hold that only material

breach of a notice provision which was *not* a condition precedent would affect the party's right to

enforce the contract – are simply inapposite.  The Trustee has cited no case law to support a

proposition that non-compliance with a notice provision that acts as a condition precedent, like

here, is a non-material breach; and the case law above demonstrates that courts have repeatedly

required parties to comply with notice requirements as a condition precedent to enforcing certain

remedies under a contract, without a showing of prejudice or materiality.  *See, e.g., Assured

Guar. Mun. Corp.*, 927 N.Y.S.2d 880; *Morgan Guar. Trust Co. of New York*, 2002 WL 818082.

## B. Timeliness of the Special Servicer's Notices of Material Breach

Having concluded that sending the notice to cure is a condition precedent to the

repurchase obligation, the next issue is whether the Special Servicer's two notices of Material

Breach were timely.

The Trustee argues that the notices, sent on March 18, 2009 (alleging a breach of the

Environmental Representation) and September 21, 2010 (alleging a breach of the No Material

Default Representation), were timely, because they were sent within three days after the Special

Servicer became "aware" (the word used in the contract) that a Material Breach had occurred,

based on an analysis of the relevant facts and law and consultation with counsel.

Morgan Stanley argues that that the Special Servicer was "aware" of the alleged breaches

much earlier.  Indeed, it contends that the Special Servicer had learned of all the relevant facts

underlying both claimed breaches by February 16, 2009 at the latest, when Wilkicki stated in her

memorandum that the Special Servicer "believe[d] it has discovered a Material Breach" of the

Environmental Representation.

On the record before me, one of the notices may be timely; the other is plainly not.

### 1. Principles of Law

It is undisputed that the Special Servicer had access to all the facts relevant to both

alleged breaches of warranty by early 2009.  The question is then, when did the Special Servicer

32

"becom[e] aware of" the Material Breaches:  upon notice of the facts underlying the breach (as

Morgan Stanley claims), or after concluding that a breach had in fact occurred (as the Trustee

argues).

As several courts have observed in cases involving securitized mortgage loans, "A party

'discovers' a breach when it knows or *should know* that the breach has occurred." *Morgan*

*Guaranty Trust Co. of New York v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 Civ.

8613 (SAS), 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002) (emphasis added); *see also*

*Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, No. 12 Civ. 2865

(KBF), 2012 WL 6062544, at *13 (S.D.N.Y. Dec. 7, 2012); *LaSalle Bank National Assoc. v.*

*Citicorp Real Estate, Inc.*, No. 02 Civ. 7867 (HB), 2003 WL 22047891, at *6 (S.D.N.Y. Aug. 29,

2003).  This formulation has been borrowed from the requirement in New York contract law that

provides that "a party wishing to rescind a contract must make this intention known promptly

after the discovery of the wrong or defect." *Morgan Guaranty Trust Co.*, 2002 WL 818082, at

*5 (quoting *K.M.L. Labs. Ltd. v. Hopper*, 830 F. Supp. 159, 166 (E.D.N.Y. 1993).  "Promptly . . .

does not mean immediately, but rather within a reasonable time." *K.M.L. Labs.*, 830 F. Supp. at

166.  "Where there is no dispute as to facts, the question of whether notice was given within a

reasonable time is a question for the court." *Morgan Guaranty Trust Co.*, 2002 WL 818082, at

*5.

In order to satisfy a "prompt" notice requirement, a party need not raise a claim

"immediately upon receiving notice of facts merely suggesting that a breach has occurred."

*Morgan Guaranty Trust Co.*, 2002 WL 818082, at *5 (citing *Am. Mfg. Co. v. U.S. Shipping Bd.*

*Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir. 1925).  This is especially true in cases, like this

one, where the underlying facts are complicated and the seller knows them better than the buyer

does. *See Am. Mfg. Co.*, 7 F.2d at 566. The notice requirement must not be interpreted to create "an incentive for [buyers] to litigate before knowing for certain that they have suffered any injury." *Morgan Guaranty Trust Co.*, 2002 WL 818082, at *5 (quoting *Vista Co. v. Columbia Pictures Industries, Inc.*, 725 F. Supp. 1286, 1295 (S.D.N.Y. 1989)). If a specific time period is given in the contract, as is the case here, then the time period begins to run only after the breach has been confirmed upon investigation. *See Policemen's Annuity*, 2012 WL 6062544, at *13 (citing *Morgan Guaranty Trust Co.*, 2002 WL 818082, at *5).

But once a party becomes aware of the relevant facts, a duty arises in the buyer "to pick up the scent and nose to the source. If the quest confirms this suspicion, then [it] must make [the] decision [to raise the claim] with reasonable dispatch." *Banque Arab Et International D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y.1994) (internal quotations omitted), *aff'd*, 57 F.3d 146 (2d Cir. 1995). While the buyer must have an opportunity to investigate and confirm any suspicions before it is required to provide notice, *see Banque Arab Et International D'Investissement*, 850 F. Supp. at 1211, a buyer must still act "promptly and diligently" once it has notice of the facts suggesting a breach.

Furthermore, its investigation into the potential breach must be conducted within a reasonable amount of time. *See Banque Arabe Et International D'Investissement*, 850 F. Supp. at 1211. This follows from the rule that a buyer can be said to have "discovered" a breach, not only if it "knows" of the breach, but also if it "should know." *See Morgan Guaranty Trust Co.*, 2002 WL 818082, at *5.

These principles concerning "discovery" of a breach apply equally to the notice to cure in this case, which must be sent within three business days after the Special Servicer became "aware" of a breach. The purpose of requiring the buyer (the Trustee) to send a notice to cure

34

"upon becoming aware of" the breaches is to put the seller (Morgan Stanley) on notice that it intends to seek cure or repurchase of the defective mortgage loan. The use of the language "becoming aware of" rather than "discover" is of no moment. Indeed, the context provided by the surrounding provisions in the contract suggests that the only reason for using "becom[e] aware of" rather than "discover" was to differentiate between two notice requirements: one that applied to "any" party to the contract that was the first to learn of a Material Breach (*i.e.*, the party to "discover" it), and the separate and additional obligation of the Servicers to send a request to cure to the Seller "upon becoming aware of" the breach – whether that awareness can be traced back to the Servicer's own "discovery" or to notice it received from some other party that discovered the breach. *See Diamond Castle Partners IV PRC, L.P. v. IAC/InterActiveCorp*, 918 N.Y.S.2d 73, 73-74 (1st Dep't 2011) ("[C]lauses of a contract should be read together contextually in order to give them meaning") (internal quotation omitted).

Thus, the Special Servicer became "aware" of a breach, as the term is used in the MLPA, as soon as it knew or should have known about the breach. That would be after it concluded its investigation into the facts suggesting that a breach had occurred, unless the investigation was not completed within a reasonable period after learning of the facts. It is simply not the case, as the Trustee asserts, that the Special Servicer had no duty to conduct its investigation promptly or diligently. *See Morgan Guaranty Trust Co.*, 2002 WL 818082, at *5; *Banque Arab Et International D'Investissement*, 850 F. Supp. at 1211.

With these principles in mind, the Court will consider whether the Special Servicer's notices were timely.

### 2.  Because Additional Discovery is Required to Assess the Timeliness of the First Notice, Defendant's Motion to Reopen Discovery or Preclude is Granted

The Special Servicer could not have had notice of facts suggesting that a Material Breach of the MLPA had occurred until after the Loan was transferred to special servicing, which occurred on November 12, 2008.  Not only did it not take over responsibility for servicing the Loan until that date, but no "Material Breach" could have existed before then; under the MLPA, for a Material Breach to have occurred, the loan must be a "Specially Serviced Mortgage Loan."

In December 2008, Wilkicki of Centerline initiated an investigation into possible breaches of representations and warranties by Morgan Stanley.  Prior to the February 16 memorandum, Wilkicki had prepared two initial reports on the status of the Loan and her investigation – on December 8, 2008 and January 21, 2009 – neither of which indicated a belief that Morgan Stanley had breached any of the representations and warranties.

In her third report, February 16, 2008 memorandum, Wilkicki stated she "believes" the Special Servicer had discovered a Material Breach of the Environmental Representation.  But Wilkicki avers that she did not conclude her investigation and make her final recommendation to management until March 16, 2009.  (Wilkicki Decl. ¶ 34.)  The February 16 memorandum, according to Wilkicki, was merely a status report intended for senior management.  It gave her opinion about a potential breach, listed some of the facts and documents she reviewed, and provided excerpts of the relevant contracts.  (Wilkicki Decl. ¶ 33.)

If, as Wilkicki contends, the Special Servicer did not conclude that a breach existed until March 16, 2009, then the First Notice was timely.  Three months to conduct an investigation into potential breaches of the representations and warranties is not per se unreasonable in a transaction of this type.  Centerline had to review potentially extensive Mortgage Loan documents and files against the IVI Report, and determine, based on fact and law, that (1) the

environmental conditions were "material and adverse," (2) Morgan Stanley was aware of the conditions at the time it made its representations, and (3) the breach of the warranty "materially and adversely" affected the value of the Mortgage Loan. *See LaSalle Bank N.A. v. CAPCO Am. Securitization Corp.*, 2005 WL 3046292, at *11 (S.D.N.Y. Nov. 14, 2005) (notice sent after two months of inquiry into facts was "prompt"). As Wilkicki points out in her declaration, sending a notice of material breach is consequential – it is potentially the first step in a process that could result in litigation. Furthermore, the PSA requires that the notice be sent to various other parties, including the rating agencies, the Trustee, the Master Servicer, Paying Agent, Certificate Registrar, and others.

But while it is incumbent upon the buyer to "confirm[] [its] suspicions" prior to taking such action, once such suspicions are confirmed, it must make the decision to bring a claim with "reasonable dispatch" – here, within three business days. Thus, if nothing of import happened in the time after February 16 in terms of the investigation – that is, if the Special Servicer can be said to have "known" that a Material Breach existed as of February 16, 2009 – then the Special Servicer (and, hence, the Trustee) will not be excused for failing to make a decision about whether to bring a claim for cure or repurchase within three days of that date. The notice to cure is a condition precedent to the repurchase obligation, and the parties plainly bargained for the "three day" provision in the contract. They are sophisticated parties, and they are free, within the limits of public policy, to agree upon conditions precedent to their obligations in a contract. *See Continental Cas. Co. v. Stronghold Ins. Co. Ltd.*, 77 F.3d 16, 19 (2d Cir. 1996). I will not rewrite the contract.

Whether it is the case that anything by way of "investigation" occurred between February 16 and March 16, 2009, and that the determination that a breach existed did not come until

Case 14-2619, Document 70, 03/04/2015, 1451940, Page110 of 138

March 16, cannot be ascertained.  The Trustee argues that the Special Servicer did not become "aware" of the breach until discussions with its lawyers on March 16, 2007.  What the Trustee is really saying is that it did not become secure in Wilkicki's preliminary assessment that she had discovered a Material Breach until Centerline consulted with counsel.

This is where Defendant's motion to reopen discovery or preclude comes into play. Plaintiff has refused to give Morgan Stanley any discovery on this issue.  But the Trustee cannot use the attorney-client privilege as both sword and shield.  If the Trustee does not want me to conclude that the Special Servicer was "aware" of the breaches as of February 16, 2009, when Wilkicki wrote her report to senior management at Centerline, it must deem the privilege waived with respect to this issue.  Otherwise, it is perfectly obvious that a Centerline employee had become "aware" of a material breach by mid-February 2009.  If, on the other hand, consultations with counsel were necessary to the Special Servicer's determination, there remains a question of why it took experienced lawyers an entire month to decide that Wilkicki's supposition was in fact correct.

I am granting Morgan Stanley's motion for leave to reopen discovery.  If the Trustee intends to rely on advice of counsel to establish the dates when it became "aware" of the Material Breach, it must disclose, within 72 hours, any and all communications with any counsel from and after the time that the loan became a Specially Serviced Mortgage Loan to and including March 18, 2009, touching on the subject of whether Morgan Stanley had breached the Environmental Representation.  The Trustee must also disclose the names of any and all attorneys who communicated with the Trustee or the Special Servicer on this issue during the same time period, and make them available for a prompt deposition.  Obviously,

"communications" includes electronic and oral communications as well as written client memoranda.

If the Trustee does not turn over the relevant material and make counsel available for deposition, I will deem the issue resolved in Morgan Stanley's favor as a matter of fact – that is, in the absence of any evidence that the Special Servicer learned anything new (from counsel or otherwise) between February 16 and March 16, 2009, I will deem it resolved that the Special Servicer had notice of the Material Breach of the Environmental Representation as of February 16, 2009 – the date on which Wilkicki set forth every fact and contractual provision of relevance and argued that the Special Servicer "believe[d]" (choosing her words carefully) that it uncovered a Material Breach.

### 3. The September 21, 2010 Notice of Material Breach of the No Material Default Representation Was Untimely

The Special Servicer has acknowledged that a subsequent investigation conducted by Duval & Stachenfeld (the Trustee's counsel) into potential breaches of the representations and warranties – which did not take place until September 2010 – did not reveal any new facts about the loan or conditions at the site. (Def.'s Summ. J., Ex. 11, Wilkicki Dep. at 130:10-135:4.) The Special Servicer received one additional document summarizing all of the outstanding NOVs on the Property from an engineering firm in "late March 2009," very shortly (within days) after the First Notice was sent. But that document did not include any new facts. (*Id.*) And the Second Notice did not go out until eighteen months later.

The Trustee nonetheless contends that, pursuant to the September investigation, the Special Servicer first became "aware" of the breach of the No Material Default Representation on September 18, 2010, and making its September 21 notice timely. I reject this argument.

The Special Servicer had in its possession all of the facts necessary to investigate and bring a claim for breach of the No Material Default Representation at the latest by March 16, 2009, when it "concluded" its first investigation into possible breaches of the representations. It "should [have] know[n]" at the time – or at least within the next few months, or even six months, or a year – if there in fact had been a breach of the No Material Default Representation. *Morgan Guaranty Trust Co.*, 2002 WL 818082, at *5.

The Special Servicer seemingly did nothing to mine the data in its possession for the next eighteen months, until litigation counsel decided to search for new claims. But this does not suffice. As discussed above, the notice requirement in the request to cure means that, if the Special Servicer is aware of facts suggesting that a breach occurred, it must investigate and choose whether to bring a claim "promptly and diligently." *See Banque Arabe Et International D'Investissement*, 850 F. Supp. at 1211. Eighteen months after discovery of all relevant facts is neither prompt nor diligent. There is substantial overlap between the facts that "suggested" a breach of the Environmental Representation and the facts that "suggested" a breach of the No Material Default Representation – both breaches relate to the methane condition on the property. Centerline and the Trustee have suggested no reason why the attorneys who were consulted back in 2009 could not or should not at that time have carefully reviewed the relevant contracts to ascertain whether the facts that gave rise to breach of the Environmental Representation also gave rise to breaches of other representations and warranties.

Since the Special Servicer failed to provide timely notice, Morgan Stanley's motion for summary judgment on the Trustee's claim of Material Breach based on the No Material Default Representation is granted.

### III. Defendant's Motion for Summary Judgment on the Issue of Waiver is Denied; Summary Judgment on the Issue is Granted to Plaintiff

Morgan Stanley also moves for summary judgment on its defense of "waiver."  It argues that, under New York law, the Trustee waived its rights to enforce Morgan Stanley's representations because, prior to securitization, Morgan Stanley disclosed to the Trustee the very same facts that the Trustee now claims demonstrate a breach of the representations.  *See Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992); *Rogath v. Siebenmann*, 129 F.3d 261, 264-65 (2d Cir. 1997).  These "facts" were disclosed in documents provided to ARCap/Centerline prior to securitization.  As described in the Background section, ARCap was the predecessor entity to Centerline; ARCap served as the "interim servicer" for the loan prior to securitization, and became Centerline at some point before the PSA was executed on May 1, 2007, when Centerline was appointed "Special Servicer" of the Loan.  In order to impute the knowledge gained by ARCap/Centerline to the Trustee, Morgan Stanley argues that, in its capacity as Special Servicer, Centerline was an "agent" of the Trustee prior to securitization.

The Trustee argues that a "no due diligence" provision in the MLPA relieves it from any argument based on actual knowledge.  That provision states that, "The fact that the Purchaser [MS Capital] has conducted or has failed to conduct any partial or complete examination of the credit files, underwriting documentation or Mortgage Files for the Mortgage Loans shall not affect the right of the Purchaser or the Trustee to cause the Seller [Morgan Stanley] to cure any . . . Material Breach . . . or to repurchase or replace the defective Mortgage Loans" pursuant to the contract.  (Pl.'s Ex. 2, MLPA § 3.)

The Trustee is correct that it had no obligation to perform due diligence prior to securitization.  Furthermore, if the Trustee *did* perform due diligence on the contents of the "credit files, underwriting documentation, or Mortgage Files" (the "Mortgage Loan Files"), it

makes no difference; the "no due diligence" clause applies whether the Trustee "*has conducted or has failed to conduct*" due diligence on the files. Under New York law, the Trustee expressly preserved its rights under the warranties with respect to any information it actually discovered or it could have discovered in those files. *See Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992); *Rogath v. Siebenmann*, 129 F.3d 261, 264-65 (2d Cir. 1997).

But the clause applies only to information that the Trustee either learned or could have learned from the Mortgage Loan Files. Morgan Stanley argues that the Trustee's agent, Centerline – acting in its capacity as interim servicer, or as part of the due diligence it conducted on behalf of the B-piece investor – learned about the environmental condition prior to securitization, not by reviewing mortgage files, but by obtaining and reviewing key documents independent of anything contained in the Mortgage Loan Files.

Documents disclosed to ARCap, as interim servicer, prior to securitization, and wholly independently of turning over the Mortgage Loan Files, include: the Closing Counsel Transaction Summary (emailed to ARCap on January 5, 2007); a December 29, 2006 letter from City View counsel Reidy to Morgan Stanley; the December 26 Letter Agreement; and the December 28, 2006 Letter Agreement.

Documents disclosed to ARCap/Centerline in connection with the B-piece due diligence (again, separate and apart from turning over the Mortgage Loan Files) include: the Wal-Mart Estoppel; Asset Summary Report, dated March 19, 2007; and IVI Report.

Centerline has acknowledged receiving the Wal-Mart Estoppel prior to securitization, in connection with the B-piece due diligence, but has not specifically acknowledged reviewing it. (Def.'s Summ. J., Ex. 11, Wilkicki Dep. 121:16-122:3.)

Wilkicki acknowledged that she and Row, another Centerline employee, reviewed the Asset Summary Report in connection with the B-piece investor due diligence sometime in March 2007, prior to securitization. (*See* Def.'s Summ. J., Ex. 11, Wilkicki Dep. at 71:13-75:21, 77:8-78:8.) No evidence has been offered to suggest that Centerline reviewed the Asset Summary Report in its capacity as the Special Servicer at any point prior to securitization. Wilkicki and Row also participated in the investigation Centerline, in its capacity as Special Servicer, began in December 2008, when the Loan was transferred for special servicing.

The IVI Report was disclosed to Centerline at some point prior to securitization both in its capacity as Special Servicer and in connection with the B-piece due diligence. Centerline has not, however, acknowledged reviewing the report prior to securitization in its capacity as Special Servicer. (*See* Def.'s Summ. J., Ex. 6.) Moreover, the fact that Centerline received the IVI Report prior to securitization, in its capacity as Special Servicer, is irrelevant – only facts that are *not* disclosed in the IVI Report can form the basis of the Trustee's claim of breach of the Environmental Representation, and as a result, the basis for Morgan Stanley's defense of waiver.

In its reply brief, Morgan Stanley identifies for the first time an additional document entitled "Base Case Comments" – apparently a document prepared by Centerline prior to securitization – which summarized information provided by Morgan Stanley and discussed elevated methane readings at the Wal-Mart store and its two-day closure. (*See* Def.'s Reply, p. 4; Def.'s Reply, Ex. B, at P026750.) I will not consider material raised for the first time on reply. In any event, the facts indicate only that the document may have been reviewed and/or created in connection with the B-piece due diligence, so it makes no difference to the analysis.

Morgan Stanley's argument could lead to some head-scratching analysis about things like whether Centerline's independent receipt of a document that could have been discovered in the

Mortgage Loan Files subjects that document to the "no due diligence" clause. But in the end, it is not necessary to undertake such analysis. Defendant's argument depends for its force on its allegation that Centerline was the Trustee's agent prior to securitization, and that its knowledge should be imputed to the Trustee. Because that argument fails, Morgan Stanley's waiver defense fails.

Under New York law, an agency relationship "results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Meese v. Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 499 (4th Dep't 1981). "The general rule is that a written power of attorney creates a principal/agent relationship." *Ruso v. Morrison*, 695 F. Supp. 2d, 33, 51 (S.D.N.Y. 2010). While parties may disclaim agency relationship in an agreement, a "court is not bound by the disclaimer of . . . agency between the parties in determining their true relationship." *Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 69 A.D.3d 71, 96-97, 886 N.Y.S.2d 133 (N.Y. 2009).

"The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985). "The agent's knowledge need not be acquired while he or she is performing services for the principal, and may include information learned in prior transactions and relationships," as long as it was in the agent's mind when acting on the principal's behalf. *Skiff-Murray v. Murray*, 17 A.D.3d 807, 809-10 (N.Y. 2005).

Morgan Stanley concedes that ARCap/Centerline did not act as the Trustee's agent in its capacity as interim servicer, nor when it conducted due diligence on behalf of the B-piece investor. (Def.'s Reply at 4.) But it insists that as of May 1, 2007, when Centerline was

appointed Special Servicer pursuant to the PSA, it began acting as the Trustee's agent in that capacity. Citing the above rule in *Skiff-Murray*, it then urges that any knowledge Centerline had gained prior to that date – as interim servicer or as part of the B-piece due diligence, and including information learned as far back as December 2006 or January 2007 – should nonetheless be imputed to the Trustee prior to securitization on May 30, 2007, the effective date of Morgan Stanley's representations.

Because there is no genuine dispute of material fact on either issue, I am granting summary judgment on the issue of waiver in favor of Plaintiff. As noted above, I can do so: it is "black letter law that a summary judgment motion 'searches the record' and thus the Court may grant summary judgment to the non-movant" where justified by the evidence in the record. *Aviation Dev. Co. v. C & S Acquisition Corp.*, No. 97–cv–9302 (AJP), 1999 WL 123718, at *2 (S.D.N.Y. Mar. 8, 1999). Here, since fact discovery closed on April 13, 2012 – well before Morgan Stanley made its motion for summary judgment in November 2012 – the facts are as developed on this issue as they ever will be.[4] Moreover, the Court will only rule in this motion on issues "identical to those raised by the moving party," so the threat of procedural prejudice is greatly diminished. *Coach Leatherware Co.*, 933 F.2d at 167.

Morgan Stanley's argument fails at both steps.

First, knowledge acquired by ARCap/Centerline in its capacity as interim servicer or as part of the B-piece due diligence cannot be imputed to the Trustee.

Any knowledge acquired by Centerline while conducting due diligence on behalf of the B-piece investor, in this case Centerline's parent company, solely for that company's own account as certificate holder, cannot be imputed to the trust or any of the other certificate holders.

---

[4] The issue on the motion to reopen discovery, which I am granting, is unrelated to waiver. The documents Wal-Mart recently produced to Morgan Stanley, which have been submitted to the Court, are also unrelated to this issue.

*See LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618, 631 (D. Md. 2002) (applying New York law).  As was observed by the court in *La Salle Bank*, an investor in the B-piece has "no duty to undertake any due diligence on behalf of the trust or any of the other certificateholders."  *Id.* at 631.  Centerline's interests with respect to investing in the B-piece would have been distinct from the concerns of other classes of certificate holders investing in the Trust (which the Trustee represents), and so any knowledge it gained cannot be imputed to the other classes of investors.

I also reject Morgan Stanley's argument that knowledge gained by ARCap/Centerline as interim servicer – while it was working *for* Morgan Stanley – should be imputed to the Trustee because the same entity later served as Special Servicer.  While knowledge acquired by an agent in prior transactions or relationships may be imputed to the principal, that knowledge must nonetheless be "in the [agent's] mind" while acting on the principal's behalf – in other words, it must be an issue relevant to the agent's scope of agency.  *See Skiff-Murray*, 793 N.Y.S.2d at 246. Morgan Stanley has offered no evidence to indicate that the Special Servicer acted on the Trustee's behalf prior to securitization, nor any facts upon which to determine any purported "scope" of agency, as will become clear below.

Second, Centerline was not the Trustee's agent for any purpose prior to securitization. There is no genuine dispute of material fact on that issue.

Morgan Stanley offers no evidence that would overcome a presumption created by the PSA that the Special Servicer was *not* an agent to the Trustee prior to securitization.  Section 8.3(f) of the PSA states:  "The relationship of each of the Master Servicers and the Special Servicer to the Trustee . . . and to each other under this Agreement is intended by the parties to be that of an independent contractor and not of a joint venturer, partner or agent."  (PSA §

8.3(f).)  In two other cases concerning a securitization transaction like this one, and a nearly identical contract provision, my colleague Judge Baer concluded that "the PSA expressly establishes that the Special Servicers are independent contractors of LaSalle as Trustee . . . therefore, the Special Servicers' knowledge and obligations under the PSA were not necessarily the same as [the Trustee's] knowledge and obligations."  *La Salle Bank N.A.*, 2003 WL 21671812, at *12-13; *see also LaSalle Bank N.A. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7867 (HB), 2003 WL 22047891, at *9 n.11 (S.D.N.Y. Aug. 29, 2003) (holding same).

While a court is not bound by such a disclaimer in determining the "true relationship" of the parties, Morgan Stanley has offered no evidence that the Special Servicer had any duties or responsibilities with respect to the loans prior to securitization – let alone anything to suggest that any actions the Special Servicer took established an agency relationship, as opposed to that of an independent contractor.

Morgan Stanley cites to Section 9.4 of the PSA, authorizing the Special Servicer to take certain actions "in the name of the Trust," after notice to the Trustee, such as initiating an action or a foreclosure proceeding.  (*See* Def.'s Summ. J., Ex. 5, PSA § 9.4, at MSMC 00221482-83.) This includes the present action, initiated by the Special Servicer on behalf of the Trustee.  That section also outlines the "general powers and duties" of the Special Servicer, including various responsibilities related to administering and servicing the loans, none of which indicate a particular kind of relationship in one way or another.  But Section 9.4 limits any agency relationship to "those instances where [the Special Servicer] is, after notice to the Trustee as provided above, taking action in the name of the Trust . . . ."  (*Id.*)  In the performance of all other duties, Section 9.4 provides that "the Special Servicer shall be an independent contractor." (*Id.*)

Morgan Stanley also cites to a provision which makes the Special Servicer responsible for reporting certain information at the request of Morgan Stanley, the "Depositor," or the "Paying Agent," parties in the PSA that were responsible for securities filings. (*Id.*, PSA at MSMC0021541-56.)

All of these "powers and duties" relate to Centerline's servicing of "Specially Serviced Mortgage Loans."  As a result, they do not commence until a loan becomes "non-performing" and is transferred to special servicing.  That did not occur until November 12, 2008, long after securitization.  Morgan Stanley has not offered any evidence that the Special Servicer was responsible for any of these functions before a loan was transferred to it for special servicing.

Morgan Stanley also offers as evidence of an agency relationship the power of attorney, which enables the Special Servicer to "perform any and all acts which may be necessary or appropriate" to enable it "to service and administer the Mortgage Loans (as defined in the Pooling and Servicing Agreement) in connection with the performance" of its duties as Servicer. But the power of attorney was not executed until May 30, 2007 – the date of securitization – so Morgan Stanley's argument that it evidences an agency relationship prior to that date fails.  If anything, the power of attorney suggests that the parties did not intend for the Special Servicer to assume its duties to service and administer the loans until after securitization.

This leaves only Morgan Stanley's argument that a single section in the PSA, assigning to the Master Servicer certain tasks – such as opening bank accounts – "On or prior to the Closing Date," as proof that the Special Servicer was an agent to the Trustee specifically in the period *prior to securitization*.  (*See* Def.'s Summ. J., Ex. 5, PSA at MSMC0021362.)  But that provision applies only to the Master Servicer, which was neither ARCap nor Centerline, the entity that eventually became the Special Servicer.  (*Id.*)

So while Morgan Stanley contends that the "actual interaction of the parties" can overcome a disclaimer of agency relationship in an agreement, it has failed to identify any such "actual interaction" between the Trustee and the Special Servicer prior to securitization. In fact, it has offered only other provisions in the very same contract, which states that, for most purposes, the Special Servicer is *not* an agent to the Trustee.

It also does not lie in Morgan Stanley's mouth to make this argument, since it is a party to the very contract that disclaims agency. While a court is not bound by a disclaimer of an agency relationship, that does not mean the disclaimer holds no weight. In this case, sophisticated parties bargained for these provisions in the PSA, and Morgan Stanley suggests no reason why they should now be ignored. It is not clear whether the Trust, created on May 1, 2007, had any bargaining power or ability to modify the provisions in the contract, but Morgan Stanley certainly did.

Contrary to Morgan Stanley's contention, it is not inconsistent to find that the Special Servicer acts as agent to the Trustee under the circumstances provided for in the PSA – such as, for example, in bringing this action – but not as an agent under entirely different circumstances – particularly when it was not responsible for taking any action on behalf of the Trustee prior to securitization. The fact that the Special Servicer was tasked with acting on the Trustee's behalf at a later date says nothing about its relationship to the Trustee on an earlier date. The evidence that Morgan Stanley has offered as demonstrating "actual knowledge" on the part of the Special Servicer – and here, the Trustee as its principal – admits only of the inference that the Special Servicer was not responsible for servicing the loan prior to securitization; all of the cited documents were disclosed to ARCap/Centerline only in its capacity as interim servicer or as part of the B-piece due diligence. No document about the nature or quality of the Mortgage Loan

was disclosed by Morgan Stanley to Centerline in its role as Special Servicer prior to securitization, except maybe the IVI Report.  While this alone is not dispositive, it further suggests the Special Servicer had no appreciable role prior to securitization – in fact, prior to securitization, it was ARCap's job as "interim servicer" to evaluate the loans, a job it performed while retained by Morgan Stanley.

Since Morgan Stanley has failed to raise any issue of fact upon which a reasonable juror could conclude that the Special Servicer acted as the Trustee's agent prior to securitization, or that knowledge gained by ARCap/Centerline prior to any purported agency relationship can be imputed to the Trustee, Morgan Stanley's defense of waiver is denied, and summary judgment on the issue is granted to Plaintiff.

## IV.  Plaintiff's Motion for Summary Judgment on Material Breach in Connection with the Environmental Representation is Denied

Plaintiff's only remaining claim is to compel Morgan Stanley to buy back the Loan because it materially breached the contract in connection with the Environmental Representation. Assuming that claim survives Defendant's challenge to the timeliness of the notice that was a condition precedent to any buy back obligation, many issues of disputed fact preclude summary judgment on the claim.  These include, but are not limited to:  how severe and extensive the methane problems were at the Wal-Mart store prior to securitization; the primary cause of the methane problems; whether the cause of those problems was adequately disclosed by the IVI Report; whether Morgan Stanley knew that any methane-related problems persisted after it received notice that problems to the sewer piping system had been fixed in March 2007, prior to securitization; and whether the methane problems at the Wal-Mart store "materially and adversely affected the value" of the Mortgage Loan.

Plaintiff's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part; summary judgment is granted to Plaintiff on Morgan Stanley's defense of waiver; and Plaintiff's motion for summary judgment is denied.  Defendant's motion to preclude, or in the alternative, to reopen discovery is granted.  The Clerk of the Court is directed to remove Docket Nos. 37, 42, and 56 from the Court's list of pending motions.

June 19, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

THE BANK OF NEW YORK MELLON TRUST
COMPANY, NATIONAL ASSOCIATION, TRUSTEE
FOR THE REGISTERED CERTIFICATE HOLDERS OF
MORGAN STANLEY CAPITAL I INC.,
COMMERCIAL MORTGAGE PASS-THROUGH
CERTIFICATES SERIES 2007-IQ14, ACTING BY
AND THROUGH C-III ASSET MANAGEMENT LLC,
AS SPECIAL SERVICER,

        Plaintiff,

    -against-                             No. 11 Civ. 505 (CM) (GWG)

MORGAN STANLEY MORTGAGE CAPITAL, INC.,

        Defendant.

———————————————————————————— x

**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S
SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

      Plaintiff The Bank of New York Mellon Trust Company, N.A. (the "Trustee"), as trustee

for investors in a multi-billion-dollar mortgage-backed securities offering, brought this action

against Defendant Morgan Stanley Mortgage Capital, Inc., the originator of one of the mortgage

loans backing the securities offering, for breach of several representations and warranties made

to investors regarding the nature and quality of that loan.  Currently before the Court is Morgan

Stanley's supplemental motion for summary judgment, which it made after this Court's June

2013 order granting a motion to reopen discovery.

      For the following reasons, the motion is granted.

## BACKGROUND

Familiarity with this Court's previous summary judgment opinion in this case, *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortgage Capital, Inc.* ("*BoNY I*"), No. 11-cv-0505 (CM) (GWG), 2013 WL 3146824 (S.D.N.Y. June 19, 2013), is presumed.

### I.   Procedural History

In *BoNY I*, this Court interpreted the parties' Mortgage Loan Purchase Agreement (the "MLPA") and held that sending a notice of cure within three business days of "becoming aware of" a Material Breach was a condition precedent to Morgan Stanley's obligation to repurchase the loan. *BoNY I*, 2013 WL 3146824, at *16-18.[1] I then went on to consider whether the Trustee had given Morgan Stanley timely notice under the MLPA as to each of the two alleged breaches in this case: (1) breach of the Environmental Representation and (2) breach of the No Material Default Representation.

First, I held that the Trustee's notice to Morgan Stanley of its claim for breach of the No Material Default Representation was untimely:

> The Special Servicer had in its possession all of the facts necessary to investigate and bring a claim for breach of the No Material Default Representation at the latest by March 16, 2009, when it "concluded" its first investigation into possible

---

[1] I reject the Trustee's present challenge to this conclusion, which amounts to an untimely motion for reconsideration. See S.D.N.Y. R. 6.3 ("Unless otherwise provided by the Court or by statute or rule . . . a notice of motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion . . . ."). "A party's failure to make a motion for reconsideration in a timely manner is by itself a sufficient basis for denial of the motion." *Grand River Enterprises Six Nations, Ltd. v. King*, No. 02-cv-5068 (JFK), 2009 WL 1739893, at *1 (S.D.N.Y. June 16, 2009). Although courts "sometimes construe untimely motions for reconsideration as being brought under Rule 60(b)," *id.* at *1 n.1, as the Trustee appears to be requesting here, that rule by its terms applies only to a "final judgment, order, or proceeding." Fed. R. Civ. P. 60(b). Neither the previous summary judgment order nor this one is a final order. See *United States v. 228 Acres of Land & Dwelling*, 916 F.2d 808, 811 (2d Cir. 1990). I thus decline to consider the Trustee's new arguments. If the Trustee disagrees with this Court's conclusion, it has a right to appeal.

2

breaches of the representations. It "should [have] know[n]" at the time—or at
least within the next few months, or even six months, or a year—if there in fact
had been a breach of the No Material Default Representation.

The Special Servicer seemingly did nothing to mine the data in its possession for
the next eighteen months, until litigation counsel decided to search for new
claims. But this does not suffice. . . . Eighteen months after discovery of all
relevant facts is neither prompt nor diligent.

*BoNY I*, 2013 WL 3146824, at \*23 (quoting *Morgan Guar. Trust Co. of N.Y. v. Bay View*

*Franchise Mortgage Acceptance Co.*, No. 00-cv-8613 (SAS), 2002 WL 818082, at \*5 (S.D.N.Y.

Apr. 30, 2002)).

The question of whether the Trustee's notice to Morgan Stanley of its claim for breach of

the Environmental Representation was more difficult. Although Jennifer Wilkicki, the Special

Servicer's asset manager, stated in a February 16, 2009 memorandum (the "Wilkicki Memo"),

that she "believe[d]" that the Special Servicer had discovered a Material Breach of the

Environmental Representation, Wilkicki submitted an affidavit to this Court in which she

averred that this statement was not a final determination on her part, and that she did not

conclude her investigation and make her final recommendation to management until March 16,

2009, two days before the breach notice was sent on March 18, 2009. In effect, the Trustee

argued that the Special Servicer "did not become secure in Wilkicki's preliminary assessment

that she had discovered a Material Breach until it consulted with counsel." *Id.* at \*22.

But because the Trustee had refused to provide Morgan Stanley with any discovery on

the issue, citing attorney-client privilege, it was impossible to ascertain whether "anything by

way of 'investigation' occurred between February 16 and March 16, 2009." *Id.* I therefore

granted Morgan Stanley's motion to reopen discovery and ordered the Trustee to produce "any

and all communications with any counsel from and after the time that the loan became a

Specially Serviced Mortgage Loan to and including March 18, 2009, touching on the subject of

3

whether Morgan Stanley had breached the Environmental Representation." *Id.* I warned the

Trustee that if it refused to waive the privilege and provide discovery, I would "deem the issue

resolved in Morgan Stanley's favor as a matter of fact." *Id.* I also warned the Trustee that "if

nothing of import happened in the time after February 16 in terms of the investigation—that is, if

the Special Servicer can be said to have 'known' that a Material Breach existed as of February

16, 2009—then the Special Servicer (and, hence, the Trustee) will not be excused for failing to

make a decision about whether to bring a claim for cure or repurchase within three days of that

date." *Id.* at *21.

## II.     New Facts from Supplemental Discovery

The following facts from the parties' supplemental discovery are undisputed.

### A.     Wilkicki's Initial Investigation

After the Mortgage Loan was transferred to special servicing on November 12, 2008, the

Special Servicer began an investigation into potential breaches by Morgan Stanley of the

representations and warranties in the MLPA.  Wilkicki led the initial investigation beginning in

November 2008.

In her Initial Asset Strategy Report, dated December 8, 2008 (the "ASR"), Wilkicki noted

that City View's records showed that rents collected for December 2008 amounted to just over

$180,000—just 36% of the rent roll of over $500,000.  (Perlstein Decl. Ex. 29 at P031402; *see*

Unell Dep. at 124:14-126:17).  In her First Amended ASR, prepared in January 2009, Wilkicki

noted that three other anchor tenants besides Wal-Mart had vacated, and that overall occupancy

at City View had dropped from 95% in July 2008 to 47% in December 2008.  (Perlstein Decl.

Ex. 36 at P003197, P003201; *see* Unell Dep. at 184:7-187:6).  The First Amended ASR further

explained that when Wal-Mart vacated in September 2008, the Debt Service Coverage Ratio

("DSCR") had fallen below 1.0, meaning that not enough money was coming in from the rents to

4

cover City View's monthly loan payments. (Perlstein Decl. Ex. 36, at P003199; Unell Dep. at
188:9-190:7).

Sometime around January 13, 2009, the Special Servicer received the Master Servicer's
File from Wells Fargo, which included, among other documents, Morgan Stanley's Closing
Counsel Transaction Summary, a document that Wilkicki reviewed at some point between
January 28, 2009 and February 10, 2009. (Perlstein Decl. Ex. 16 at P002501-2; Perlstein Decl.
Ex. 6 at P008375; Perlstein Decl. Ex. 14, ("Supp. Wilkicki Dep.") at 126:24-129:1). In her
contemporaneous notes of her review of these documents, Wilkicki noted that she had identified
a "rep and warranty exception" in the Closing Counsel Transaction Summary, stating that certain
facts were not addressed in the IVI Report, including "numerous 'notices of violation' issued by
the Ohio Environmental Protection Agency." (Perlstein Decl. Ex. 6 at P008388; Supp. Wilkicki
Dep. at 127:19-128:19; *see* Perlstein Decl. Ex. 1 at P007228). Jenna Unell, the Special
Servicer's Associate General Counsel, later testified that Wilkicki had found "sort of a smoking
gun." (Perlstein Decl. Ex. 3 ("Unell Dep.") at 19:8-13).

On or about January 30, 2009, the Special Servicer learned that Wal-Mart had terminated
its lease at City View Center. (Perlstein Decl. Ex. 30; Unell Dep. at 100:21-101:21). The
Special Servicer had known that Wal-Mart had permanently closed its store since September 15,
2008, when Wells Fargo told it so. (Perlstein Decl. Ex. 28).

### B.   In-House Counsel's Sign-Off and the Subsequent Delay

On February 16, Wilkicki drafted the Wilkicki Memo and emailed it to Unell, who
reviewed it and its supporting documents, and had a conversation with Wilkicki. (*Id.* at 232:4-
236:14). Three days later, on February 19, 2009, Unell wrote the following email to Wilkicki:

> Jennifer:
> I have reviewed the documents relating to the potential breach claim against
> Morgan Stanley in respect of the referenced loan. I agree that there is evidence

5

> that MS knew that there were material environmental conditions or circumstances
> affecting the Property that were not disclosed in the Phase I report. Please call me
> to discuss further. *I think that the breach notice should be sent*.

(Perlstein Decl. Ex. 4 (emphasis added)).

It bears repeating that Unell did not learn about the potential claim against Morgan

Stanley for the first time when she saw the Wilkicki Memo on February 16. She already knew

before February 16 that Wilkicki and Chris Crouch (Wilkicki's supervisor) believed there "ha[d]

to be some kind of claim" against Morgan Stanley given the environmental issues at the

Property. (Unell Dep. at 60:15-17, 199:6-200:1). Unell also was aware "early on" that, for the

Special Servicer to have a claim, it needed evidence that Morgan Stanley had knowledge of an

environmental condition that was not disclosed in the IVI Report. (*Id.* at 200:2-201:4). In her

February 19 email, Unell told Wilkicki that there was such evidence, and that "the breach notice

should be sent." (Perlstein Decl. Ex. 4).

The MLPA gave the Special Servicer three days to send out notice of any breach.

However, Wilkicki did not complete a draft of a breach notice until twelve days later, on March

3. (Perlstein Decl. Ex. 5). This draft notice stated that: (1) there was evidence of a material

breach, and (2) the breach had a material and adverse effect on the Property and Loan. (*Id.* at

P037389-91). In a paragraph titled "Adverse Effects of Breach," the notice cited Wal-Mart's

departure from City View and the fact that, as result, other tenants had also departed or were

paying reduced rent. The notice went on:

> The combined effect of the tenants' action has been a decimation of the operating
> revenue such that the Mortgaged Property cannot meet its basic expenses. In
> summary, the violations affecting the Mortgaged Property prior to the Closing
> Date and perpetuated by the Mortgagor and others have had severe adverse affects
> [*sic*] upon the Mortgaged Property, the Mortgage Loan and the Certificate
> holders.

(*Id.*). All of the cited facts were known to the Special Servicer prior to January 30, 2014.

6

It took Unell ten days to review the draft notice.  In fact, on March 10, Wilkicki reminded

her attorney about the pending notice by asking in an email, "Jenna, have you had a chance to

look at this?" (Perlstein Decl. Ex. 67 at P037826).  Finally, on March 13, Unell returned the

breach notice to Wilkicki, having removed the "Adverse Effects of Breach" paragraph—the one

that listed all facts known to the Special Servicer over a month and a half earlier.  (Perlstein

Decl. Ex. 7 at P037921-24).  Neither her edits nor her cover email indicated that there were any

outstanding issues to be resolved in order to confirm that a material breach existed.  (Perlstein

Decl. Ex. 7).  Wilkicki replied the same day that she agreed with Unell's edits, and sent the

notice to senior management.  (Perlstein Decl. Ex. 8).

### C.    Senior Management's Rubber-Stamp Approval

On March 14, 2009, Wilkicki sent the breach notice to her supervisor, Chris Crouch, who

responded on March 16: "I am good to go on this…please send to Paul [Smyth] for go ahead to

release…thanks." (Perlstein Decl. Ex. 9; Perlstein Decl. Ex. 39).  On March 16, Wilkicki sent

the notice to Paul Smyth (the Special Servicer's President) with the following note:  "I'm now

ready to send the attached breach letter, but wanted you to see it first and let me know you are ok

with my sending it out.  Jenna has edited and Chris has seen as well." (Perlstein Decl. Ex. 11;

Perlstein Decl. Ex. 13 ("Smyth Dep.") at 30:2-14).

At their depositions, however, neither Crouch nor Smyth remembered having performed

any analysis or having reviewed any particular document relating to the breach investigation.

(Perlstein Decl. Ex. 12 ("Crouch Dep.") at 110:9-111:9, 116:21-118:8, 124:22-127:21; Smyth

Dep. at 116:6-116:20; 118:17-123:9, 124:24-126:2, 127:11-128:14, 130:18-132:7).  Although

Crouch testified that he had had "constant communications" with Wilkicki and had

communicated with her "from the time we began to initiate if there's a potential breach through

the point in time when we decided and received approval to proceed with the notice," he could

7

not specifically remember any of those communications, and he did not even remember whether he reviewed the breach notice. (Crouch Dep. at 109:20-23, 110:9-24, 122:8-124:5). Smyth remembered only that he reviewed the final breach notice before it was sent. (Smyth Dep. at 117:14-118:1). There is no evidence that Crouch or Smyth contributed anything to the breach investigation, whether by conducting original analysis or by confirming that Wilkicki's analysis was correct.

### D.    In-House Counsel's "Struggling and Grappling"

Unell testified (both in her individual capacity and as a Rule 30(b)(6) witness) that between February 19 (when she stated "I think that the breach notice should be sent") and March 18 (when the notice was actually sent), she reviewed many documents and was "struggling and grappling" with many issues. (Perlstein Decl. Ex. 4; Perlstein Decl. Ex. 6; *see, e.g.*, Unell Dep. at 30:14-31:4, 238:13-239:3, 276:12-277:25, 294:18-24).

Despite all this "struggling and grappling," the only specific analysis that Unell could recall performing was reviewing the documents that the Special Servicer already possessed, and that Wilkicki had already reviewed, before February 16. The only documents that Unell remembered reviewing were the Closing Counsel Transaction Summary, the IVI Report (which also included the Rough Order of Magnitude ("ROM")), the Environmental Insurance Policy, the Ohio EPA Complaint, the MLPA and the PSA, as well as the loan documents. (Unell Dep. at 232:4-233:18, 238:13-239:3; *see* Perlstein Decl. Ex. 1). Moreover, Unell admitted that, by the time she sent her February 19 email, she had already reviewed the "smoking gun"—the Closing Counsel Transaction Summary—which stated that the IVI Report had failed to disclose Notices of Violation ("NOVs"). (Perlstein Decl. Ex. 1; Unell Dep. at 19:8-9, 102:7-15, 234:11-23).

When Unell was asked what happened between February 19 and March 3 (when Wilkicki sent her the draft notice), Unell responded: "I don't really have a specific recollection of what

8

happened during that particular period." (Unell Dep. at 272:7-13). When asked what she did
between March 3 and March 10 (when Wilkicki nudged her about reviewing the notice), Unell
responded: "Again, I can't really distinguish between the timeframe. During that entire period
we were still making – reviewing all of the documents to determine that we had an appropriate
basis to make a claim such as this. And we were reviewing a multitude of documents." (*Id.* at
275:18-276:4). Unell testified that between March 16 and March 18, she spoke with Smyth
about whether the notice should be sent, but she could not recall the number or duration of the
conversations, whether she reviewed any documents with him, or specifically what was
discussed. (*Id.* at 226:7-229:7).

     **E.**     **Outside Counsel's Lack of Involvement in the Breach Investigation**

     In December 2008, the Special Servicer retained Richard O'Halloran as outside counsel
for the purposes of pursuing remedies against City View and/or the Guarantor (Thomas Klein),
which primarily involved having a receiver appointed by the court. (Perlstein Decl. Ex. 18
("O'Halloran Dep.") at 65:3-66:11, 69:9-71:16; 79:10-23; Perlstein Decl. Ex. 20 at
RAO000005). Although O'Halloran acknowledged in his deposition that he was not involved in
the breach investigation, he did state that he had one conversation with Wilkicki sometime
between February 16 and March 18 in which claims against Morgan Stanley were mentioned.
(O'Halloran Dep. at 117:9-118:18, 168:18-169:2). Other than this, O'Halloran had no
knowledge of the breach investigation. (O'Halloran Dep. at 128:25-131:15; 196:19-198:10).

     Before the City View loan was transferred to special servicing in November 2008, Harold
Hagen, then an attorney at Dechert LLP, had been engaged by Wells Fargo to conduct a cursory
analysis of whether Morgan Stanley had breached the Environmental Representation. (Perlstein
Decl. Ex. 19 ("Hagen Dep.") at 40:22-42:9; *see* Perlstein Decl. Ex. 69). Hagen's involvement in
the Special Servicer's investigation between February 16 and March 18, 2009 consisted of one

9

brief conversation with Wilkicki on March 13. In that call with Wilkicki—which, Hagen

testified, lasted only three or four minutes (and which is reflected in his time entries as lasting

0.1 hours)—Hagen told Wilkicki that his previous work had revealed no obvious breach of

representation, and that he had produced no work product. (Hagen Dep. at 55:6-56:19, 66:1-

67:13; Perlstein Decl. Ex. 24 at P038223).

**F.      Appraisal Issues**

Although Wilkicki wrote in her February 16 memorandum that there had been a

"material and adverse effect" on the value of the Mortgage Loan (and substantiated that

conclusion with documents), Wilkicki testified in her supplemental deposition that the Special

Servicer was unable to conclude that the breach had any such effect until it had learned, via a

commissioned appraisal, the precise value of the City View Property. (Perlstein Decl. Ex. 1 at

P07288; Supp. Wilkicki Dep. at 181:25-183:6, 200:7-201:22, 203:10-18). Of course, Wilkicki

received a draft appraisal on February 27, 2009 that reported a value of $22.3 million as

compared to the appraised value of $103.4 million two years earlier; that was consistent with the

loss of tenant after tenant and the precipitous drop in rent collections. Nonetheless, Wilkicki

stated that she could not rely on the appraisal until she had "substantiated" it with the help of a

Review Appraiser. She claimed that this occurred no later than March 13. (Perlstein Decl. Ex.

26 at P037936; Perlstein Decl. Ex. 2 at MSMC0022882; Supp. Wilkicki Dep. at 83:17-84:21,

117:25-118:12, 167:3-168:1, 177:10-23, 202:21-24, 203:10-18).

Wilkicki never mentioned the appraisal or the Review Appraiser in the papers she

previously filed in opposition to Morgan Stanley's original motion for summary judgment. To

the contrary, she previously testified that she learned no new facts after February 16, 2009. (*See*

Perlstein Decl. Ex. 37 at 128:18-129:7)). During supplemental discovery, however, Wilkicki

claimed that these new pieces of information were "instrumental" and "critical" components of

10

her investigation. (Supp. Wilkicki Dep. at 76:8-13, 93:5-8, 159:2-9.) Similarly, Unell also

testified that the Special Servicer needed an "expert opinion" (an appraisal) to determine the

current value of the Property before it could make any decisions with respect to Morgan Stanley.

(Unell Dep. at 26:10-26:23.)

This is, of course, errant nonsense. In her February 16 memorandum, Wilkicki

specifically wrote that "additional facts are detailed herein to demonstrate *the material and*

*adverse effect* the breach has on the interests of the holders of the Certificates in the Mortgage

Loan," and then detailed both the environmental issues and the departure of Wal-Mart and other

tenants. (Perlstein Decl. Ex. 1 at P007228 (emphasis added)). Wilkicki's claim in her

supplemental deposition that, despite what she wrote at the time, she still needed to "quantify"

the negative effect of such catastrophes on the loan is nothing more than a desperate effort to

rewrite the historical record. (*See* Supp. Wilkicki Dep. at 85:6-87:4). The dates do not work in

the Trustee's favor.

In any event, on February 16, the appraiser, Andrew Lorms of Cushman & Wakefield,

left a message on Wilkicki's voicemail, stating that the appraisal was nearly done and that he had

"definitive values" for her if she needed them. (Perlstein Decl. Ex. 22 at P038198; *see* Perlstein

Decl. Ex. 64). There is no evidence that Wilkicki ever called Lorms back before she received the

draft appraisal on February 27. (Supp. Wilkicki Dep. at 89:4-90:16).

## DISCUSSION

### I.    Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact"

and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed. R.

Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In addressing a

motion for summary judgment, the court "must view the evidence in the light most favorable to

11

**SPA-64**

the party against whom summary judgment is sought and must draw all reasonable inferences in

his favor. *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Whether any disputed

issue of fact exists is for the court to determine. *See Balderman v. United States Veterans*

*Admin.*, 870 F.2d 57, 60 (2d Cir. 1989).  The moving party has the initial burden of

demonstrating the absence of a disputed issue of material fact. *See Celotex v. Catrett*, 477 U.S.

317, 323 (1986).  Once such a showing has been made, the non-moving party must present

"specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The party

opposing summary judgment "may not rely on conclusory allegations or unsubstantiated

speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

 Not every disputed factual issue is material in light of the substantive law that governs

the case.  "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.  Finally, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita*, 475 U.S. at 586.  To withstand a summary judgment motion,

sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-

moving party. *See Anderson*, 477 U.S. at 248.

**II.   Morgan Stanley's Supplemental Motion for Summary Judgment on the Ground of Untimely Notice is Granted.**

 That the Special Servicer became aware of a material breach of the Environmental

Representation more than three business days before March 18, 2009, the breach notice was sent

to Morgan Stanley, is so amply proven as to be irrefutable.

 The record shows that, even before she prepared the Wilkicki Memo on February 16,

Wilkicki knew that (1) the Closing Counsel Summary contained a "rep and warranty exception"

12

showing that Morgan Stanley had likely breached the Environmental Representation; and (2)

Wal-Mart had vacated the City View Property and terminated its lease, which showed that the

breach was likely "material" under the MLPA.  Armed with this information, Wilkicki wrote her

February 16 memorandum, which stated, in part:

- "The Special Servicer believes it has discovered a Material Breach of the Seller's Representations and Warranties and hereby provides notice as required by the governing Pooling and Servicing Agreement."

- "The Special Servicer has discovered that the Seller was aware of material and adverse environmental conditions and circumstances affecting the Mortgaged Property that were not disclosed in the Environmental Report."

- "Although the [Closing Counsel Transaction Summary] quite clearly identifies the violation of [the Environmental Representation], additional facts are detailed herein to demonstrate the material and adverse effect the breach has on the interests of the holders of the Certificates in the Mortgage Loan."

- "As a result of the unresolved notices of violation, the Ohio EPA filed a lawsuit in July 2008 . . . ."

- "The anchor tenant, WalMart, vacated its space and discontinued rent payments, citing 'safety concerns and conditions for its customers and employees which rendered the Premises untenantable.'"

- "As a result of WalMart's action, several other tenants have exercised co-tenancy clauses in their leases, which provide for reduced rents, terminated leases or have discontinued rent payments."

(Perlstein Decl. Ex. 1 at P007228-30).

And if it was not already aware when Wilkicki finished drafting her memo on February

16, the Special Servicer certainly became aware of Morgan Stanley's material breach three days

later, on February 19, when Unell, the Special Servicer's Associate General Counsel, wrote to

Wilkicki, "I agree that there is evidence that MS knew that there were material environmental

conditions or circumstances affecting the Property that were not disclosed in the Phase I report.

Please call me to discuss further. *I think that the breach notice should be sent*."  (Perlstein Decl.

Ex. 4 (emphasis added)).  Unell's vague, rambling deposition testimony—in which she

essentially stated only that she spent a month "struggling" and "grappling" with her review of

documents that the Special Servicer had received in January, and that Wilkicki had already

reviewed before February 16—does not create a genuine issue of fact on this point.  Unell's

February 19 email, in which she (1) agreed with Wilkicki that Morgan Stanley knew of

environmental conditions that had not been disclosed in the IVI Report, and (2) *specifically

stated that she thought the breach notice should be sent*, does not alter the devastating facts, of

which Wilkicki was indisputably aware.

Perhaps recognizing its predicament, the Trustee now argues for the first time that the

Special Servicer needed to obtain a formal appraisal of the City View property before it could

determine conclusively that Morgan Stanley had committed a "Material Breach" under the

MLPA.  But by February 16, Wilkicki already knew that (1) Wal-Mart, the property's most

important tenant, had permanently closed its store and terminated its lease; (2) three other anchor

tenants besides Wal-Mart had also vacated; (3) overall occupancy at the property had dropped

from 95% in July 2008 to 47% in December 2008; and (4) the property's DSCR had fallen below

1.0, which meant that not enough money was coming in from rents to cover City View's monthly

loan payments.  This was not a situation in which the Special Servicer needed an appraisal to

know that the value of the City View Property had been materially and adversely affected.

And even if were such a situation, an appraisal was there for the taking.  On February 16,

Andrew Lorms of Cushman & Wakefield left a phone message for Wilkicki in which he said that

his appraisal of the City View Property was nearly done and that he had "definitive values" for

her if she needed them.  Wilkicki never called him back.  This obvious attempt to stall failed on

February 27, when Lorms sent in his draft appraisal anyway—an appraisal that reported a market

14

value of $22.3 million (a 78.4% drop from its previously appraised value of $103.4 million in January 2007).

In short, the Special Servicer probably became aware of Morgan Stanley's alleged breach prior to February 16, when Wilkicki prepared her memorandum, but certainly became aware of it by February 19, when Unell agreed with Wilkicki's assessment and instructed her to send the breach notice. Even giving the Trustee every possible benefit of the doubt, the absolute, drop-dead date on which the Special Servicer became aware of the material breach was February 27, when the draft appraisal came in. Three business days after February 27 was March 3—two full weeks before the Special Servicer eventually sent the breach notice. The breach notice was therefore untimely under the MLPA.

## CONCLUSION

For the foregoing reasons, Morgan Stanley's supplemental motion for summary judgment is granted. The Clerk of the Court is directed to remove Docket No. 81 from the Court's list of pending motions and to close the file.

Dated: June 16, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

15